**GRW ENTERPRISES, INC.,**
**Plaintiff/Appellee,**

v.

**Bruce G. DAVIS, Trustee,**
**Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

April 27, 1990.

Permission to Appeal Denied by
Supreme Court Sept. 24, 1990.

Peter H. Curry, Boult, Cummings, Conners & Berry, Nashville, for defendant/appellant.

Kenneth R. Jones, Jr., M. Andrew Hoover, O'Hare, Sherrard & Roe, Nashville, for plaintiff/appellee.

## OPINION

KOCH, Judge.

This appeal involves a dispute concerning the exercise of an option to purchase a tract of real property. The optionee brought suit in the Chancery Court for Davidson County after the option-giver refused to convey the property. The trial court heard the case without a jury and awarded the optionee specific performance and damages. The option-giver has appealed. We affirm the judgment for specific performance because the option-giver was estopped from asserting that the option

had expired; however, we also reduce the judgment for damages.

## I.

Gilbert R. Walker owns GRW Enterprises, Inc. ("GRW"), a corporation in the business of assisting oil companies in finding locations for gasoline service stations. In the summer of 1987, Mr. Walker learned of some suitable property in the Bellevue area of Davidson County near the intersection of Highway 70 and I–40. He showed the property to a site developer for Gulf Oil Company who expressed an interest in buying it.

The property was part of a six to seven acre tract owned by a partnership represented by Bruce G. Davis. Mr. Walker began negotiating with Mr. Davis in early September, 1987 for a 90–day option to purchase a portion of the property fronting on Highway 70. Mr. Walker told Mr. Davis that he intended to option the property to Gulf and even showed Mr. Davis a rendering of the type of service station Gulf planned for the site. The plans envisioned that the service station would have two access points on Highway 70, and Mr. Walker and Mr. Davis discussed the need for obtaining governmental approval for curb cuts[1] at each of these locations.

Mr. Walker and Mr. Davis agreed on the basic terms of the transaction on September 15, 1987. Mr. Davis agreed to give Mr. Walker an option to purchase a 46,000 square foot tract for $368,000, and Mr. Walker agreed that Mr. Davis could retain a 25–foot easement on the property's eastern and western boundaries for access to the remainder of the property. In a separate agreement, Mr. Davis agreed to permit Gulf to erect a sign at another location on his property near the interstate with the understanding that he could also use the sign to advertise his nearby storage facility.

Mr. Davis would not accept Mr. Walker's standard option agreement and insisted that his lawyer draft the option. On September 19, 1987, he gave Mr. Walker a redrafted option agreement. The first page of the agreement was dated September 15, 1987 and provided on the second page that

1.2 The term of the Buyer's option to purchase the Property shall commence on the date hereof and shall continue through and including December 15, 1987 (the "Option Period"). Buyer shall exercise its option by delivering written notice to Seller within the Option Period by registered or certified mail, or in person. Buyer may, prior to the expiration of the then current Option Period, extend the Option Period to January 15, 1988, upon payment to Seller of Five Thousand and No/100 Dollars ($5,000.00) and may further extend the same to February 15, 1988 upon an additional payment of Five thousand and No/100 Dollars ($5,000.00). These extension payments shall be nonrefundable and shall not apply to the purchase price.

Mr. Walker met with Gulf's site developer on September 22, 1987. He gave Gulf a 90–day option to purchase the property, and Gulf requested two changes in his option with Mr. Davis. First, Gulf wanted the option period in Mr. Walker's option with Mr. Davis to coincide with the period in its option with Mr. Walker. Second, it wanted to reduce the price for extending the option from $5,000 to $2,500.

Mr. Davis and Mr. Walker met again on September 23, 1987. Mr. Walker told Mr. Davis that Gulf wanted to "book the deal" in 1987 but that it "may need a few extra days to close because it would be over the Christmas holidays and the first of the year." He also told Mr. Davis that Gulf would only agree to pay $2,500 to extend the option. Mr. Davis agreed to reduce the extension price because he was convinced that Gulf intended "to close or execute the option in December." He stated that Gulf's request for a few extra days was "no big deal" because "once they execute the option the sales contract comes into

---

1. Curb cuts are the means of ingress and egress to a street. They are simply cuts in the curb that allow automobiles to pass in and out. They must be approved by the city's Division of Traffic and Planning.

play and what's a few extra days in waiting for your money."

Accordingly, Mr. Davis changed the option's execution date from September 15 to September 23, and both parties interlineated and initialed changes in paragraph 1.2 reducing the cost of the initial option extension from $5,000 to $2,500. After making these changes, Mr. Walker gave Mr. Davis a $7,500 check as consideration for the option. They made no other changes to the option agreement, and thus the agreement still provided that Mr. Walker's option expired on December 15, 1987.

Both parties point to November, 1987 as a turning point in their dealings. Mr. Walker thought that "everything started going down hill" because of announcements concerning a mall being constructed near the property. Mr. Davis, for his part, became concerned because he understood that Mr. Walker had declined to be responsible for obtaining the curb cuts that would give him full use of his access easements.

The option agreement was silent concerning the responsibility for obtaining the curb cuts for Mr. Davis' access easements. On November 12, 1987, Mr. Davis' lawyer telephoned Mr. Walker to discuss the location of these curb cuts. In a letter written the next day confirming the conversation, the lawyer stated that Mr. Davis would not convey the property if the location of the curb cuts did not coincide with the location of his easements.

The parties' relationship became further strained when Mr. Walker and Gulf's site developer met with Mr. Davis in early December to request his approval of an addendum to the option agreement concerning the service station's sign and the location of the curb cuts. Mr. Davis categorically rejected the addendum, stating that he would not agree to only one curb cut and that selling Gulf the property for the sign and granting an access easement "would be very poor judgment on my part." The meeting ended with no agreement on either point, and Mr. Davis was "under the impression that the deal was probably going sour."

In an effort to satisfy both Gulf and Mr. Davis, Mr. Walker decided to seek governmental approval for three curb cuts. On December 14, 1987, he showed Mr. Davis and Mr. Davis' lawyer a revised site plan. He also told them that the Division of Traffic and Planning had indicated informally that it would approve three curb cuts and had agreed to review the revised plan on December 21, 1987. Apparently through oversight, neither Mr. Davis nor his lawyer mentioned the language in the agreement stating that the option was scheduled to expire the next day. Instead, they approved the revised site plan and wished Mr. Walker luck in his meeting with the city.

Mr. Davis' lawyer confirmed the December 14, 1987 discussion in a letter written later that same day. He reiterated Mr. Davis' rejection of Gulf's proposed addendum, stating that Mr. Davis would not agree to convey the property on which Gulf's sign would be located and that he continued to insist on two curb cuts that coincided with his easements. The letter likewise did not mention the option deadline and concluded by stating that "Mr. Davis is hopeful that the option will be exercised."

Mr. Walker obtained preliminary approval for the three curb cuts on December 21, 1987. He immediately telephoned both Gulf and Mr. Davis with the news. Since Mr. Davis was not in, he arranged to deliver a letter exercising the option the next day. Mr. Davis was not at his office on December 22, 1987 when Mr. Walker arrived. However, one of his associates reached him by telephone, and Mr. Walker read Mr. Davis his letter that stated

> Please be advised that I am this date exercising the Option to Purchase on your property at Highway 70 South and I–40, Bellevue. The closing date will be on or before February 22, 1988.

Mr. Davis made no response other than to instruct Mr. Walker to leave the letter on his desk.

Mr. Walker's proposal to close "on or before February 22, 1988" angered Mr. Davis because he construed it as an attempt to "crook" him out of his extension

fees. On December 23, 1987, feeling that he "had enough of it," Mr. Davis prepared a letter to Mr. Walker, stating, in part:

> As you know, Gulf Oil Company requested a number of changes in the terms of the option agreement, some of which were acceptable to us and some of which were not. I assume that your statement that you would close under the option on or before February 22, 1988 is another change requested by Gulf Oil Company because the contract requires that the closing take place within thirty days after the exercise of the option. In any event, the "OPTION AGREEMENT" expired on December 15, 1987 under its own terms.

Mr. Walker tried unsuccessfully for several days to contact Mr. Davis after receiving his letter. When he finally met with Mr. Davis in early January, 1988, Mr. Davis told him that "you let the date slip up on you. If you had only left the check here for $2500 everything would have been okay." Mr. Walker offered to pay Mr. Davis $2,500, but Mr. Davis stated that he and his partner would not accept it.

Mr. Walker filed suit a month later seeking specific performance of the option agreement and damages. He sought to avoid the legal consequences of the option's December 15, 1987 deadline using three theories—that the parties had agreed to extend the option deadline by eight days, implied contract, and equitable estoppel. The trial court found in GRW's favor on every issue, directed Mr. Davis to convey the optioned property, and awarded GRW $5,173.

## II.

We turn first to Mr. Davis' challenge to the admissibility of GRW's proof concerning the parties' negotiations between September 15 and September 23, 1987. Mr. Davis insists that the parol evidence rule and the statute of frauds should have prevented the introduction of this evidence.[2] While we disagree with the trial court's factual justification for admitting the evidence, we have determined that the evidence was admissible to prove that the written option did not accurately reflect the parties' agreement and to prove GRW's claim of waiver or estoppel.

### A.

The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts. *Maddox v. Webb Constr. Co.*, 562 S.W.2d 198, 201 (Tenn.1978). Since courts should not look beyond a written contract when its terms are clear, *Newark Ins. Co. v. Seyfert*, 54 Tenn.App. 459, 484, 392 S.W.2d 336, 348 (1964), the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract. *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn.1985); *Clayton v. Haury*, 224 Tenn. 222, 226, 452 S.W.2d 865, 867 (1970).

The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, *Brunson v. Gladish*, 174 Tenn. at 316, 125 S.W.2d at 147; *Bryan v. Hunt*, 36 Tenn. (4 Sneed) 543, 547–48 (1857); *Trice v. Hewgley*, 53 Tenn.App. 259, 267–68, 381 S.W.2d 589, 593 (1964), or to prove the existence of an independent or collateral agreement not in conflict with a written contract. *McGannon v. Farrell*, 141 Tenn. 631, 637,

---

**2.** Mr. Davis also asserts that the principle of merger rendered this evidence incompetent. The principle of merger, or more accurately integration, states that prior or contemporaneous negotiations and agreements are integrated into a contract intended by the parties to be a complete expression of their agreement. It is part of the rationale for the parol evidence rule, *Brunson v. Gladish*, 174 Tenn. 309, 315–16, 125 S.W.2d 144, 146–47 (1939); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 838 (Tenn.Ct. App.1980); Restatement (Second) of Contracts § 213 (1979); 9 J. Wigmore, *Evidence in Trials at Common Law* § 2425 (Chadbourn Rev.1981); 3 A. Corbin, *Corbin on Contracts* § 573 (1960); therefore, we will include it as part of the discussion of the parol evidence rule.

214 S.W. 432, 433 (1919); *Isabell v. Aetna Ins. Co.*, 495 S.W.2d 821, 824 (Tenn.Ct.App. 1971). In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.

■ The courts have also recognized certain circumstances that permit contracting parties to vary or to circumvent the plain terms of their written contract. Thus, the parol evidence rule does not prevent using extraneous evidence to prove that a written contract does not correctly embody the parties' agreement, *Davidson v. Greer*, 35 Tenn. (3 Sneed) 384, 384 (1855); *Rentenbach Eng'g Co., Constr. Div. v. General Realty, Ltd.*, 707 S.W.2d 524, 526–27 (Tenn. Ct.App.1985); *Gibson County v. Fourth & First Nat'l Bank*, 20 Tenn.App. 168, 178–79, 96 S.W.2d 184, 190 (1936); 3 A. Corbin, *Corbin on Contracts* § 582 (1960), or to prove estoppel or waiver. *Woods v. Forrest Hills Cemetery*, 183 Tenn. 413, 421, 192 S.W.2d 987, 990 (1946); *Freeze v. Home Fed. Savs. & Loan Ass'n*, 623 S.W.2d 109, 112 (Tenn.Ct.App.1981); *Bailey v. Life & Casualty Ins. Co.*, 35 Tenn. App. 574, 582, 250 S.W.2d 99, 102 (1952).

### B.

■ Tennessee's statute of frauds, Tenn. Code Ann. § 29-2-101 (1980), is intended to avoid basing certain types of agreements on faulty memories. *Boutwell v. Lewis Bros. Lumber Co.*, 27 Tenn.App. 460, 465, 182 S.W.2d 1, 3 (1944). It is a rule of formality [3] requiring that actions to enforce certain types of contracts must be based on written evidence of the parties' agreement. *Huffine v. McCampbell*, 149 Tenn. 47, 78, 257 S.W. 80, 89 (1923). Thus, it avoids fraud and perjury with regard to certain types of contracts. *Baliles v. Cities Serv. Co.*, 578 S.W.2d 621, 623 (Tenn.1979); *Disney v. Henry*, 656 S.W.2d 859, 861 (Tenn. Ct.App.1983).

The courts have found real estate to be one of the most valuable types of property. *Harris v. Morgan*, 157 Tenn. 140, 148–49, 7 S.W.2d 53, 55 (1928). Thus, in order to protect property owners, *Irvin v. Dawson*, 197 Tenn. 314, 317, 273 S.W.2d 6, 7 (1954), Tenn.Code Ann. § 29-2-101(4) includes contracts for the sale of land within the coverage of the statute of frauds.

■ While the statute should be strictly adhered to and construed to accomplish its purpose, *Newnan v. Carroll*, 11 Tenn. (3 Yer.) 18, 25–26 (1832), it should not be used to avoid contracts or to "grant a privilege to a person to refuse to perform what he has agreed to do." *Cobble v. Langford*, 190 Tenn. 385, 390, 230 S.W.2d 194, 196 (1950). The courts have accordingly recognized that equitable estoppel is an exception to the statute of frauds, *Daugherty v. Toomey*, 189 Tenn. 54, 65, 222 S.W.2d 197, 199 (1949); *Beazley v. Turgeon*, 772 S.W.2d 53, 58 (Tenn.Ct.App.1988), and that equitable estoppel can be used to relieve a party from the statute of frauds where enforcement would make the statute an instrument of hardship and oppression. *Baliles v. Cities Serv. Co.*, 578 S.W.2d at 624.

Estoppel and waiver can be used to defeat the unconscionable use of the statute of frauds. *See* 3 S. Williston, *A Treatise on the Law of Contracts* § 533A, at 797 (3d ed. 1960). As Professor Corbin notes

> one who has orally induced a changed performance by the other should not escape payment therefor, and one who has orally prevented the other from performing as the writing required should not be permitted to charge the other with a wrongful breach.

2 A. Corbin, *Corbin on Contracts* § 307, at 106 (1950); *see also* 2 A. Corbin, *Corbin on Contracts* § 310, at 114–15 (1950).

### C.

The parol evidence rule and the statute of frauds are separate rules that operate independently from each other. *See Bryan v. Hunt*, 36 Tenn. (4 Sneed) 543, 545–46 (1857); 9 J. Wigmore, *Evidence in Trials at Common Law* § 2454 (Chadbourn Rev. 1981). They are occasionally applied in the

---

**3.** *See* 9 J. Wigmore, *Evidence in Trials at Common Law* § 2454 (Chadbourn Rev.1981).

same case, usually with confusing and unfortunate results.[4]

The statute of frauds does not exclude parol evidence; it simply makes certain agreements unenforceable through suit unless they are evidenced by a signed memorandum. The parol evidence rule protects a completely integrated written contract from being varied or contradicted by extraneous evidence but does not require any particular type of agreement to be in writing. *See* 3 A. Corbin, *Corbin on Contracts* § 575 (1960).

Thus, evidence that does not run afoul of the parol evidence rule may be ineffective under the statute of frauds, and vice versa. *See Brewing Corp. of America v. Pioneer Distributing Co.*, 194 Tenn. 588, 592, 253 S.W.2d 761, 762–63 (1952); *Badger v. Boyd*, 16 Tenn.App. 629, 643, 65 S.W.2d 601, 609 (1933). Their combined operation is particularly troublesome in cases involving oral modifications to contracts subject to the statute of frauds. Professor Wigmore has pointed out that an

> oral alteration makes a new transaction together with the terms of the original transaction. Yet the result is that the new transaction as a whole is no longer in writing as required by the statute [of frauds], but is partly oral and partly written; and thus, although the mere alteration is in itself not expressly required to be in writing, the transaction as a whole is now unenforceable.

9 J. Wigmore, *Evidence in Trials at Common Law* § 2455, at 183 (Chadbourn Rev. 1981).

### D.

We now turn to the application of these principles to the facts of this case. The trial court's decision to admit Mr. Walker's testimony concerning the parties' dealings between September 15 and September 23, 1987 rests on its finding that Mr. Walker and Mr. Davis entered into two separate option agreements—one on September 15, 1987 and another on September 23, 1987. This finding is incorrect, but even though it caused the trial court to admit the evidence on erroneous grounds, we agree that the evidence was admissible.[5]

The evidence preponderates against the trial court's finding that Mr. Walker and Mr. Davis entered into two binding option agreements. While they agreed upon most of the essential terms of the option on September 15, 1987, no binding option existed at that time because no written option contract had been executed and because no consideration had changed hands.[6]

Mr. Davis testified, without contradiction, that his attorney prepared a revised option agreement and that he signed the agreement and gave it to Mr. Walker on September 19, 1987. Even though this document satisfied the statute of frauds, no

---

**4.** Professor Corbin has noted

> Both the statute and the rule may have caused more litigation than they have prevented. Both may have done more harm than good ... And both alike have forced the courts, in the effort to prevent them from doing gross injustice to honest men, to make numerous exceptions and fine distinctions, with such resulting complexity and inconsistency that a reasoned statement of their operation requires volumes instead of pages and the case must be rare in which a plausible argument can not be made for deciding either way.

3 A. Corbin, *Corbin on Contracts* § 575 (1960).

**5.** Tenn.R.App.P. 36(a) directs this court to "grant the relief on the law and the facts to which the party is entitled or the proceeding otherwise requires." Thus, it is incumbent on us to apply the law controlling the case whether or not it is cited or relied upon by either party. *City of Memphis v. IBEW, Local 1288*, 545

S.W.2d 98, 100 (Tenn.1976). We may also use different grounds to affirm the trial court's decision when we agree with the result but not with the trial court's reasoning. *Continental Casualty Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn.1986); *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1978); *Duck v. Howard*, 729 S.W.2d 110, 113 (Tenn.Ct.App.1986).

**6.** An option to sell real property is no more than a revocable offer unless it is in writing and is supported by adequate consideration. *Bradford v. Foster*, 87 Tenn. 4, 8–9, 9 S.W. 195, 196 (1888); *Rice v. Crump*, 5 Tenn.Civ.App. (Higgins) 146, 155 (1914). Options to sell real property are also within the statute of frauds. *Griese–Traylor Corp. v. First Nat'l Bank*, 572 F.2d 1039, 1042 (5th Cir.1978) (construing Tennessee law); Restatement (Second) of Contracts § 125 comment c (1979); 2 A. Corbin, *Corbin on Contracts* § 417 (1950).

enforceable option contract came into existence at that time because of the lack of consideration. Thus, only a revocable option to sell still existed on September 19, 1987.

All the ingredients for a binding option contract coalesced on September 23, 1987. Mr. Davis and Mr. Walker concurred in the final revisions to their agreement. They also completed signing the agreement, and Mr. Walker paid Mr. Davis the agreed-upon consideration. Thus, the sole written option agreement is the September 23, 1987 option agreement.

■ The trial court's rationale for admitting GRW's evidence is undermined if the parties had only one option agreement. In the absence of a second option, the evidence was not admissible to prove the existence of a subsequent or collateral agreement.[7] There are, however, other grounds for admitting the evidence. It was admissible to prove that the final version of the written option did not accurately reflect the parties' agreement and to prove that Mr. Davis should be estopped from relying on the December 15, 1987 expiration date.

## III.

■ GRW had the task of convincing the trial court that its exercise of the option on December 22, 1987 was effective even though the written agreement stated that the option expired on December 15, 1987. It based its case on three theories and relied, at least in part, on parol evidence to prove each one.

GRW claimed that the parties actually agreed to extend the option deadline by eight days but that they failed to change the expiration date when they changed the execution date from September 15, 1987 to September 23, 1987. It also claimed that the parties' conduct after September 23, 1987 is consistent with the agreement to extend the option and that Mr. Davis should be estopped from invoking the December 15, 1987 deadline because his conduct induced GRW to forego extending the

option period as it had a right to do. While we agree that an option-giver is normally not required to notify its optionee of a clearly expressed expiration date, we have determined that Mr. Davis cannot assert that Mr. Walker's exercise of the option was not timely under the facts of this case.

Mr. Davis knew on September 22, 1987 that Gulf desired that the terms of the two options coincide. He does not seriously dispute that he and Mr. Walker originally agreed to a ninety-day option or that they discussed Gulf's request and then agreed to change the execution date from September 15 to September 23, 1987. Under the facts of this case, changing the execution date, by itself, would have had no legal significance. Mr. Davis and Mr. Walker did not intend to perform a meaningless act, and therefore, we conclude that they intended to extend the option but overlooked making the necessary revisions in paragraph 1.2.

When Mr. Davis threatened not to perform, Mr. Walker took it upon himself to obtain governmental approval for the curb cuts even though the option agreement did not impose this obligation on him. On December 14, 1987, "forgetting" the December 15 expiration date, Mr. Davis and his lawyer approved the revised plans and encouraged Mr. Walker to seek governmental approval and to exercise the option, even though they knew that the Division of Traffic and Parking would not review the plans until December 21, 1987. Their conduct led Mr. Walker to believe that they too were not relying on the original expiration date. Had either Mr. Davis or his lawyer conveyed a different understanding to Mr. Walker, he would have exercised his right to extend the option.

The parties' conduct after September 23, 1987 is consistent with an understanding that the option's expiration date had been extended. From the very beginning, Mr. Davis gave Mr. Walker the impression that waiting a few extra days for his money would be "no big deal" as long as Mr. Walker exercised the option in December,

---

7. In any event, the agreements could not have been collateral because they involved the same subject matter. *See McGannon v. Farrell,* 141 Tenn. 631, 638, 214 S.W. 432, 434 (1919).

1987. In reality, his after-the-fact reliance on the December 15 expiration date appears to stem from his irritation over Mr. Walker's proposal to close "on or before February 22, 1988." Accordingly, we find that Mr. Davis is estopped to rely on the expiration date in the written option.

### IV.

Mr. Davis also insists that Mr. Walker's exercise of the option was ineffective because it was contrary to the terms of the option agreement. We disagree. While Mr. Walker's exercise letter proposed a closing date that differed from the option agreement, it did not provide Mr. Davis with grounds to repudiate the contract.

The option agreement only required GRW to give written notice that it had exercised the option.[8] The purchase and sale agreement provided that the parties would agree upon a closing date not later than thirty days after the buyer exercised the option.[9] Mr. Walker's exercise letter proposed a closing "on or before February 22, 1988." We do not view the exercise letter as a "unilateral amendment" to the purchase and sale agreement. It leaves open the possibility to closing before February 22, 1988, and it does not state that Mr. Walker is unwilling or unable to close at an earlier time.

■■■■ In order to justify repudiating a contract, the repudiating party must prove that the other party has actually defaulted, has unequivocally renounced, or is completely unable to perform. *Brady v. Oliver*, 125 Tenn. 595, 617, 147 S.W. 1135, 1140 (1911). Mr. Walker's suggestion of an alternative closing date does not fit within any of these grounds. Mr. Davis' action was premature. Without inquiring, he had no basis to conclude that GRW would not or could not close as required by the purchase and sale agreement.

---

**8.** Paragraph 1.2 of the agreement states:
Buyer shall exercise its option by delivering written notice to Seller within the Option Period by registered or certified mail or in person.

**9.** Paragraph 2.2 of the option states:

### V.

Finally, Mr. Davis takes issue with the relief fashioned by the trial court. He asserts that GRW has failed to prove that it is entitled to specific performance and that the ancillary damages were erroneously calculated.

### A.

■■■■ Specific performance is an equitable remedy. *T.J. Moss Tie Co. v. Hill*, 191 Tenn. 582, 586, 235 S.W.2d 587, 588 (1951); *Gilson v. Gillia*, 45 Tenn.App. 193, 218, 321 S.W.2d 855, 866 (1959). It is not available as a matter of right but is discretionary with the trial court depending on the facts of each case. *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn.1979). Specific performance is not available unless the contract is clear, definite, complete, and free from any suspicion of fraud or unfairness. *Johnson v. Browder*, 185 Tenn. 601, 605, 207 S.W.2d 1, 3 (1948).

■■■■ Courts do not, as a general matter, award specific performance when the injured party can be fully and adequately compensated with damages. *Shuptrine v. Quinn*, 597 S.W.2d at 730. However, specific performance is regarded as appropriate when dealing with contracts for the conveyance of real property because real property is unique, and more often than not, an award of damages is simply not an adequate remedy. *Radiophone Broadcasting Station v. Imboden*, 183 Tenn. 215, 219, 191 S.W.2d 535, 537 (1946); *Blair v. Snodgrass*, 33 Tenn. (1 Sneed) 1, 25 (1853); *Brister v. Estate of Brubaker*, 47 Tenn.App. 150, 163, 336 S.W.2d 326, 332 (1960).

■■■■ We concur with the trial court's finding that an award of damages alone is not an adequate remedy in this case. Gulf has exercised its option and now has a binding contract with GRW to purchase the property. Even though Gulf has not yet

The purchase of the Property shall be closed upon a date fixed by mutual agreement of the parties, but in no event later than thirty (30) days from the date of exercise of Buyer's option pursuant to Section I hereinabove.

called upon GRW to perform, it has a contractual right to do so. If it does, GRW will be unable to perform unless the court has awarded specific performance. Without specific performance, GRW faces a lawsuit and the attendant expenses that cannot be easily determined, and Gulf loses the incalculable benefit of locating one of its service stations on the property. Therefore, under the facts of this case, the only adequate remedy is specific performance.

### B.

The trial court also awarded GRW interest on its lost profits to compensate for its lost use of the profits from the sale to Gulf. However, the interest was calculated on GRW's gross profits rather than the net profits.

Mr. Davis contends, and GRW appears to agree, that the damages should have been calculated on GRW's net profits. Tenn. Code Ann. § 20–10–103 (Supp.1989) empowers us to suggest a remittitur in order to do equal justice to the parties. Since GRW is not contesting Mr. Davis' argument on this point, we find that the damage award should be based on GRW's net profits of $34,636.30 and, therefore, that the damages should be reduced from $5,172.10 to $4,544.35.

### VI.

For the reasons stated herein, we modify the amount of the damage award to $4,544.35 and affirm the judgment, as modified, and remand the case to the trial court for further proceedings. We also tax the costs of the appeal to Bruce G. Davis, Trustee, and his surety for which execution, if necessary, may issue.

TODD, P.J., and LEWIS, J., concur.