MIKE LUZADDER and ) 
WENDY LUZADDER, ) 
 ) 
    Plaintiffs/Appellees, ) 
 ) Appeal No.
 ) 01-A-01-9706-CH-00239
VS. ) 
 ) Grundy Chancery
 ) No. 4626
JERRY FOWLER, ) 
 ) 
    Defendant/Appellant. ) 

**FILED**

**January 28, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CHANCERY COURT OF GRUNDY COUNTY
AT ALTAMONT, TENNESSEE

THE HONORABLE JEFFREY F. STEWART, CHANCELLOR

AUBREY L. HARPER
114 North College Street
Post Office Box 588
McMinnville, Tennessee 37111-0588
    Attorney for Plaintiffs/Appellees

PAUL D. CROSS
100 Highway 64 West
Post Office Box 99
Monteagle, Tennessee 37356
    Attorney for Defendant/Appellant

AFFIRMED AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The Chancery Court of Grundy County specifically enforced an oral promise to sell a house and lot, by holding that the seller was estopped to raise the statute of frauds as a defense. We affirm.

## I.

In October of 1994 Mike Luzadder and his wife and family were living in a double wide trailer in Tracy City. Mr. Luzadder knew Jerry Fowler, a partner in an automobile shop in Sewanee, where they worked on some cars together and were building a race car that Mr. Luzadder was going to drive.

Mr. Fowler owned a house and lot on the North Bluff in Sewanee. He lived in part of the house, but the other rooms were unheated and some of the water pipes had burst the winter before. Mr. Fowler had previously listed the house for sale, but had been unsuccessful in finding a buyer.

According to Mr. Fowler he offered the house to the Luzadders for a cash price of $38,000, and they tried but failed to get financing from a lending institution. Then the parties agreed to a $38,000 sales price with a $4,000 down payment and the $34,000 balance to be financed over a fifteen year period. The $4,000 down payment was to be paid by $2,000 in cash and the transfer of the double wide trailer to Mr. Fowler.

The Luzadders' version of the agreement differs from Mr. Fowler's only with respect to the down payment. They testified that the trailer alone satisfied the $4,000 due up front.

The Luzadders vacated the trailer and moved into the house. They repaired the water pipes and added another heater to the unheated part of the home.

They also had a written lease-purchase agreement prepared by their attorney. The agreement obligated them to pay $365.00 per month for fifteen years[1] (beginning in November of 1994), at which time they would become the owners of the property. The agreement also provided that the trailer alone would satisfy the down payment.

Mr. Fowler refused to sign the written agreement, mainly because of the dispute over the down payment. He did not repudiate the agreement, however; he continued to accept the $365.00 monthly payments, for which he executed a receipt titled "house payment." He also hired a handyman to move the trailer. The mover removed the porches and broke the trailer apart, but because of inclement weather he couldn't move the trailer before March, when it was destroyed by fire. The Luzadders had mortgage insurance on the trailer and it paid the remaining balance on their mortgage.

In the meantime, the Luzadders had converted a carport into another bedroom, a closet, and a bath. They also replaced the water heater. During the course of the construction Mr. Fowler advised them that they didn't have the agreement signed yet and that it would be unwise to make major renovations. After the trailer burned in March, Mr. Fowler told the Luzadders that he wanted to withdraw from the deal because he had lost the down payment. In July of 1995 he refused their payment and later sought possession of the house through legal means. The Luzadders filed this action to stop the eviction process and to enforce the contract.

The chancellor found as a fact that the parties agreed on a sale of the home for $38,000; that the buyers were to make a $4,000 down payment and to pay the balance at $365.00 per month over fifteen years. The chancellor did not resolve the dispute over whether the buyers agreed to pay $2,000 in cash in addition to

_____

[1]It is not clear how the amount of the payment was calculated, but the $365.00 monthly payment amortizes a $34,000 loan over fifteen years at ten percent interest.

transferring the trailer to the seller, or whether the trailer alone satisfied the down payment. The chancellor avoided that dispute by holding that when the trailer was destroyed by fire, the risk of loss had not passed to Mr. Fowler. Therefore, the Luzadders still owed the $4,000 down payment. But, contingent on payment of the $4,000 and all past due monthly installments, the chancellor enforced the agreement.

## II.

### a.

Our statute of frauds prohibits the enforcement of contracts for the sale of real estate unless "The promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith . . . ." Tenn. Code Ann. § 29-2-101(4). Contrary to the general rule elsewhere, in Tennessee, the statute prevents enforcement of the oral contract even though the parties have partially performed. *Baliles v. Cities Service Co.*, 578 S.W.2d 621 (Tenn. 1979); *Knight v. Knight*, 436 S.W.2d 289 (Tenn. 1969); *Goodloe v. Goodloe*, 92 S.W. 767 (Tenn. 1906). It is also true that the note or memorandum that satisfies the statute of frauds must contain the essential terms of the agreement, *Beazley v. Turgeon*, 772 S.W.2d 53 (Tenn. App. 1989), and a description by which the property can be located, *Baliles v. Cities Services*, 578 S.W.2d 621 (Tenn. 1979); *Brister v. Brubaker's Estate*, 336 S.W.2d 326 (Tenn. App. 1960). Therefore, neither the part performance nor the receipts signed "house payment" are sufficient to satisfy the statute of frauds.

### b.

The harshness of the above rules, however, "has been mitigated by the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual

fraud." *Baliles v. Cities Service*, 578 S.W.2d at 624. The Luzadders insist that this is such a case.

The first question we must answer, however, is whether the parties ever had a meeting of the minds on the sale of the house. The chancellor found as a fact that they did agree on a sale price of $38,000, a $4,000 down payment, and the balance to be paid over fifteen years at $365.00 per month. The evidence fully supports that finding, but does the dispute over how the down payment was to be made rob the agreement of the certainty required for enforceability?

The fact that there is now a dispute over how much cash was to be paid on the front end does not mean that the parties did not agree on that point. It is possible that one side or the other is now seeking to gain an advantage by repudiating their actual agreement. It is also possible that their minds never met. But, implicit in the chancellor's ruling is a finding that the parties agreed on the essential terms of the contract. He simply did not find it necessary to specifically rule upon which version of one of those terms was correct, since the destruction of the trailer had made the question moot. Mr. Fowler was entitled to $4,000 as a down payment, and since the risk of loss of the trailer had not passed to him, none of the $4,000 had been paid. Therefore, the chancellor reasoned, regardless of whose version of the agreement we accept, he is still entitled to be paid $4,000.

We think the evidence supports a conclusion that the parties did have a meeting of the minds. The Luzadders took possession and started to improve the property; Mr. Fowler accepted their payments -- not as rent, but as "house payments;" and he did not repudiate the sale until the trailer burned, when he feared that he must bear the loss. It is not necessary to decide whether their minds met on the buyers' or the seller's version of the agreement, since Mr. Fowler has been awarded the $4,000 down payment.

The remaining question is whether Mr. Fowler is estopped to raise the statute of frauds as a defense. We think that this is the proper case for the application of the doctrine because the statute of frauds should not be used to "avoid contracts or to 'grant a privilege to a person to refuse to perform what he has agreed to do.'" *GRW Enterprises Inc. v. Davis*, 797 S.W.2d 606 (Tenn. App. 1990) quoting *Cobble v. Langford*, 190 Tenn. 385, 230 S.W.2d 194, 196 (1950).

It cannot be disputed that the parties agreed on the essential terms of the sale. The buyers took possession, repaired the house, added additional heat, and started an addition to the house before they knew that the seller wanted to withdraw from the deal. In addition, they have lost a place to live if they are forced to move from the house. Their trailer burned in March of 1995 while Mr. Fowler was preparing to move it. Mr. Fowler argues that the buyers were on notice immediately that they didn't have an agreement when he refused to sign the written contract. But, his subsequent actions -- taking charge of the trailer and accepting the "house payments" until July of 1995 -- would lead an ordinary person to believe that he had ratified the transaction. It is also undisputed that he did not unequivocally repudiate the agreement until after the trailer burned and he felt that he had lost the down payment.

The chancellor found that the Luzadders had enhanced the value of the property by $2,000 before they had any notice of a problem with the transaction. Mr. Fowler argues that the court could restore them to the status quo by awarding them $2,000 and applying their monthly payments to the fair rental value of the house. But that argument ignores the loss of the trailer. They have lost the trailer irretrievably and irreparably. We think equity demands that the parties be held to their bargain.

The judgment of the trial court is affirmed and the cause is remanded to the Chancery Court of Grundy county for any further proceedings necessary. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, JUDGE

- 7 -

CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
WILLIAM C. KOCH, JR., JUDGE