IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 23, 2009 Session

## WENDELL P. BAUGH, III, ET AL. v. HERMAN NOVAK, ET AL.

**Direct Appeal from the Chancery Court for Williamson County**
**No. 32631      Timothy L. Easter, Chancellor**

_____

**No. M2008-02438-COA-R3-CV - Filed August 13, 2009**

_____

This case arises out of a business agreement between the parties. Plaintiffs executed a note to purchase a company. The note contained a stock transfer restriction. Subsequently, Plaintiffs entered into a business agreement with Defendants. The subject of that agreement is disputed in this lawsuit, but Plaintiffs contend that Defendants purchased one-half of the company and executed an indemnity agreement to indemnify Plaintiffs for one-half of the note on the purchase of the company. After operating for nearly ten years, the company failed. At trial, Plaintiffs sought to enforce the indemnity agreement, and Defendants counterclaimed to recover $73,000.00 that they paid to Plaintiffs before they allegedly executed the contract. The trial court found in Plaintiffs' favor. Defendants now appeal claiming that the trial court made several evidentiary errors, that the contract is unenforceable because it violated the statute of frauds, that parol evidence regarding the terms of the contract was inadmissible, and that the corporation cannot continue its existence and sell stock after dissolution. We reverse the trial court's determination based on our finding that the contract is unenforceable as a matter of public policy.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J., joined. ALAN E. HIGHERS, P.J., W.S., filed a dissenting opinion.

Paul R. White and Keith A. Turner, Nashville, Tennessee, for the appellants, Herman Novak and Faith Novak.

Stephen C. Knight and Nader Baydoun, Nashville, Tennessee for the appellees, Wendell P. Baugh, III, and Laura W. Baugh.

# OPINION

## Background/Procedural History

In this breach of contract claim, the parties were unquestionably conducting business together, but they dispute whether there was a valid contract indemnifying a stock-purchase transaction. The parties do not dispute that whatever contract might have existed is no longer available. Plaintiffs Wendell P. Baugh, III and Laura W. Baugh, together "the Baughs" or "Plaintiffs" argue that a final contract was signed but that the contract was destroyed in a fire. Defendants Herman Novak and Faith Novak, together "the Novaks" or "Defendants" contend that they never signed the final contract because they discovered that the Baughs could not transfer their stock rights.

The trial court filed a Memorandum Opinion. To place the case in proper perspective we copy his findings of fact in toto:

> This dispute is centered on the existence or non-existence of an alleged stock purchase and indemnity agreement. Plaintiffs have filed a Petition for Writ of Attachment to which the Defendants answered and filed a counter complaint seeking a judgment against the Plaintiffs for the return of considerations paid for purchase of a certain sale of stock by the Plaintiffs to the Defendants. Alternatively, the Defendants are seeking a credit to any amount to which Plaintiffs may be entitled.

> A bench trial was conducted on July 16 and 17, 2008. The Court having now reviewed each party's proposed findings of facts and conclusions of law, considered the evidence received at the trial and the entire record makes the following findings of fact and conclusions of law:

> . . . .

> In 1992 the Baughs purchased from Ronald and Gayla Miller a company called Precision Service, Inc. (Precision). Precision was acquired through an asset purchase agreement and all stock was placed in Laura Baugh's name. Wendell Baugh actually managed, operated and ran the company. Pursuant to the purchase agreement, Precision became obligated on a note to the Millers and the Baugh's guaranteed payment of the Miller note.

> The Baughs and Novaks became neighborhood friends in 1993. It is undisputed that the Baughs and Novaks had acted as business partners in other ventures beginning with buying a foreclosed on house. Since 1994 the parties were business partners in a separate company called Penske Plastics whose ownership was put into Mrs. Baugh's and Mrs. Novak's name.

Wendell Baugh testified that in 1995 he decided to extend his partnership with Mr. Novak to include not only Penske Plastics but Precision as well. It is undisputed that these 1995 negotiations regarding the sale of one-half (½) of Precision to the Novaks took place. It is undisputed that Herman Novak wrote three separate checks totaling $67,000.00 during the spring and fall of 1995. Check number 1547 written on March 5, 1995, in the amount of $25,000.00 clearly states on its face on the FOR line "half of cash for 50% of Precision Serv. Inc." Check number 193859 written on April 26, 1995, in the amount of $25,000.00 clearly states on its face in the FOR portion "final payment for half ownership of Precision Services." Check number 0107 written on September 29, 1995, in the amount of $17,000.00 clearly states on the FOR line "50% of Precision paid in full." The fact that these checks were paid by Herman Novak to Wendell Baugh are undisputed and highly significant to this Court.

It is also undisputed that some time during this period Herman Novak had a draft Indemnity Agreement prepared that would buy half of Precision and indemnify the Baughs for 50% of their obligations on the Miller note.

An April 1995 meeting occurred at the office of Attorney Sam McAllester to finalize the Baugh/Novak Precision partnership. Attorney McAllester had also handled the closing of the partnership of Baugh/Novak for the purchase of Penske in 1994. While the [Novaks] cannot clearly recall this meeting, the Baughs do recall the meeting as its purpose- to finalize the Precision partnership.

According to Wendell Baugh, for his 50% ownership of Precision, Herman Novak would receive 50% of Precision's positive cash flow from July 1, 1994 to June 30, 1995 fiscal year. Going forward, Herman Novak would be 50% owner of Precision.

50% ownership between Baugh and Novak was the clear ownership appearance and operation of Precision for the next several years. Tax returns from 1995 to 2003 indicate Wendell P. Baugh and Herman Novak as 50/50 owners. Precision employee Darren Collum and Precision bookkeeper Jean Hardin each believed that both Wendell Baugh and Herman Novak were 50/50 owners of Precision.

Herman Novak's own conduct demonstrated a perception and belief of ownership. Mr. Novak listed Precision on several financial statements provided to banks in support of loan applications. Additionally, Herman Novak borrowed money to fund Precision including funding of payments on the Miller note. Mr. Novak further authorized payments from Penske Plastic (of which he owned 50%) to Precision so that Precision could make payments on the Miller note.

Complicating the facts of this case is a fire that occurred in 2003 at the facility where many of the company records were stored. It is in this fire that Wendell Baugh contends that the crucial documents to this dispute (i.e., the Stock Purchase and Indemnity Agreement) were destroyed.

The Novaks presented proof that they did not enter into the stock purchase and Indemnity Agreement for 50% ownership of Precision. The Novaks engaged in negotiations to purchase half interest in Precision but the Novaks claim they simply did not execute any documents and enter into such an agreement. The Novaks additionally claim breach of contract for the payment of $73,000.00 in cash for the purchase of certain shares of stock of Precision. Further the Novaks claim fraud on the part of the Baughs for attempting to sell stock already pledged to satisfy the Miller note.

The Baughs are requesting damages in the amount of $201,715.00. The Novaks are claiming that the Baughs' Petition for Writ of Attachment should be dismissed and that they (the Novaks) should be awarded a judgment in the amount of $73,000.00 for failure of consideration.

The trial court entered judgement in favor of the Baughs for $201,715.50. The trial court dismissed the Baughs' claim for promissory estoppel and the Novaks' claim for breach of contract and fraud. The trial court found that there was a written contract between the parties that was destroyed in a fire. In addition, the court found that despite the fact that the Baughs were unable to present a written contract, the contract was enforceable under the statute of frauds because the parties partially performed their duties under the contract. In regards to the stock transfer restriction, the trial court found that the language in the Miller Loan Agreement limiting the transfer of Precision stock would not void the transaction between the Baughs and the Novaks. The trial court held that "[t]he limitation on transfer of stock language in the Miller Loan Agreement had no effect on the Novaks. It neither deprived them of the consideration they received (50% ownership in Precision) nor relieved them of their obligations in the Indemnity Agreement."

### *Issues*

As stated in their brief, Appellants raise the following eight issues on appeal:

1.       Whether the Chancellor erred in allowing admission of documents produced by Subpoenas issued against and served upon Bank of Nashville and First State Bank, when they were improperly prepared and served.

2.       Whether the Chancellor erred in determining that this case is not controlled by the Statute of Frauds, Tenn. Code Ann. § 29-2-101, *et seq.*

-4-

3.	Whether the Chancellor erred in determining that there was sufficient proof adduced at trial of the existence of an agreement in writing for the Novaks to guarantee the Miller Note to then allow parol evidence to explain any ambiguities.

4.	Whether the Chancellor erred in determining that the facts of this case rise to the level of being so exceptional as to create the exception of promissory or equitable estoppel to the statute of frauds.

5.	Whether the Chancellor erred in determining the existence of partial performance sufficient to take this case out of the Statute of Frauds.

6.	Whether the Chancellor erred in failing to find that Mr. Baugh fraudulently induced Mr. Novak to enter into negotiations for the purchase of stock in Precision when he knew, or should have known, that the stock was pledged and could not be further assigned and that the corporate charter had been revoked.

7.	Whether the Chancellor erred in ruling that after the dissolution of a corporate charter, the corporation can sell stock and continue its corporate existence.

8.	Whether the Chancellor erred when he did not find that the failure to call as a witness one who has peculiar knowledge of the essential facts concerning the supposed contents and execution of the alleged agreement between the parties gives rise to the presumption that his testimony would not be favourable [sic] to the plaintiffs.

### *Standard of Review*

Because the trial court adjudicated this case without a jury, we review the decision *de novo* upon the record and presume the correctness of the trial court's factual findings. Tenn. R. App. P. 13(d); *Fowler v. Wilbanks*, 48 S.W.3d 738, 740 (Tenn. Ct. App. 2000). We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). If the trial court fails to make findings of fact, however, our review is *de novo* with no presumption of correctness. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App.1995). On the other hand, we review the trial court's application of law *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Similarly, we review mixed questions of law and fact *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).

### *Statute of Frauds*

The Novaks assert that the trial court made several evidentiary errors in this case. We address only those arguments that are applicable to our ultimate determination on this appeal. As we perceive it, the Novaks claim that because their agreement with the Baughs is subject to the statute of frauds, parol evidence should not have been admitted at trial. The Novaks' argument, however, conflates two distinct legal concepts. As we have previously articulated, the parol evidence rule and the statute of frauds are separate rules that operate independently from each other. *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 611 (Tenn. Ct. App. 1990).

> The statute of frauds does not exclude parol evidence; it simply makes certain agreements unenforceable through suit unless they are evidenced by a signed memorandum. The parol evidence rule protects a completely integrated written contract from being varied or contradicted by extraneous evidence but does not require any particular type of agreement to be in writing.
>
> Thus, evidence that does not run afoul of the parol evidence rule may be ineffective under the statute of frauds, and vice versa.

*Id.* at 612 (internal citations omitted). We, therefore, address each of these issues separately.

We note, foremost, that "[a] defense predicated upon the statute of frauds must, of necessity, presume that the parties had an agreement but that Tenn. Code Ann. § 29-2-101 renders this agreement unenforceable because it is one of those species of agreements required to be in writing." *Price v. Mercury Supply Co. Inc.*, 682 S.W.2d 924, 931 (Tenn. Ct. Ap. 1984). The Statute of Frauds prohibits a party from maintaining certain types of contract actions without a written note or memorandum of the alleged agreement, signed by the party to be charged. *Shedd v. Gaylord Entm't. Co.*, 118 S.W.3d 695, 697 (Tenn. Ct. App. 2003). Tennessee's Statute of Frauds requires that guaranty contracts and agreements that cannot be performed within one year be made in writing in order to be enforceable. Tenn. Code Ann. § 29-2-101(a). In Tennessee, the Statute of Frauds is codified at Tennessee Code Annotated Section 29-2-101 and provides in pertinent part:

> (a) No action shall be brought:
>
> . . . .
>
> (2) To charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person;
>
> . . . .
>
> (5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. In a

contract for the sale of lands, tenements, or hereditaments, the party to be charged is the party against whom enforcement of the contract is sought.

Tenn. Code Ann. § 29-2-101(a)(Supp. 2008).

The parol evidence rule, on the other hand, prohibits parties from using extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract. *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990). There are, however, various exceptions to the parol evidence rule. For example, the rule does not prevent a party from introducing parol evidence to prove the existence of an agreement made after an earlier written agreement or to prove the existence of an independent or collateral agreement that does not conflict with the written contract. *Id.* at 610–11. Additionally, the parol evidence rule does not prohibit the use of extraneous evidence to prove that a written contract does not embody the parties' agreement. *Id.* at 611.

In this case, Plaintiffs do not contend that they had an oral agreement with the Novaks for the sale of stock. Rather, their contention is that there was a written purchase and indemnification agreement. We have previously held that so long as the original contract agreement was made in writing, the subsequent destruction of that document does not render the agreement unenforceable pursuant to the statute of frauds. *Petty v. Estate of Nichols*, 569 S.W.2d 840, 843-44 (Tenn. Ct. App. 1977). We stated, in that same case, that it is not error for the trial court to admit parol evidence to establish the existence and terms of that destroyed writing. *Id.* As was the case in *Petty*, the parol evidence that the Baughs submitted at trial sought to establish the existence and the terms of the contract itself, not to alter or qualify any written terms of the agreement. We find, therefore, no error in the trial court's admission of parol evidence. Nor do we find error in the trial court's decision that the statute of frauds did not render the contract unenforceable; the trial court found as a matter of fact that the parties executed a written contract that was subsequently destroyed, and the evidence does not preponderate against that determination. Based upon our finding, we need not address the Novaks' contention that the promissory or equitable estoppel exception or the partial performance exception to the statute of frauds does not apply.

### *Contract*

We do find, however, that the stock purchase and indemnification contract was unenforceable on public policy grounds. Our task for resolving disputes concerning contract interpretation is to ascertain the parties' intent based upon the usual, natural, and ordinary meaning of the language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). Determining the parties' intention is a question of law "because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Id.* at 890. Throughout the proceedings, Defendants contended that the stock transfer restriction affected Plaintiffs' subsequent ability to contract for the sale of the Precision shares. We agree.

Courts should generally not interfere in a contract except to carry out the intentions of the parties and the terms of the contract, unless those terms violate public policy. *Guiliano v. Cleo Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999). Therefore, contract provisions that are contrary to public policy may be invalidated. *Purkey v. Am. Home Assurance Co.*, 173 S.W.3d 703, 705 (Tenn. 2005). A contract does not violate public policy unless it tends to harm the public good, public interest, or public welfare, or to conflict with the constitution, laws, or judicial decisions of Tennessee. *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991). "Because the determination of public policy is primarily a function of the Legislature, the judiciary may only determine public policy 'in the absence of any constitutional or statutory declaration." *Purkey*, 173 S.W.3d at 705 (quoting *Alcazar v. Hayes*, 982 S.W.2d 845, 851 (Tenn. 1998)). In determining whether a contract violates public policy, the purpose of the contract is important. *Hoyt v. Hoyt*, 372 S.W.2d 300, 304 (Tenn. 1963).

In this case, Tennessee's legislature has set out the public policy regarding the restriction of stock transfers. Tennessee Code Annotated states the following:

> (b) A restriction on the transfer or registration of transfer of shares is valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this section and its existence is noted conspicuously on the front or back of the certificate or is contained in the information required by § 48-16-207(b). Unless so noted, a restriction is not enforceable against a person without knowledge of the restriction.[1]

---

[1] The statute states in its entirety:

**Restriction on transfer of shares and other securities**.–

(a) The charter, bylaws, an agreement among shareholders, or an agreement between shareholders and the corporation may impose restrictions on the transfer or registration of transfer of shares of the corporation. A restriction does not affect shares issued before the restriction was adopted unless the holders of the shares are parties to the restriction agreement or voted in favor of the restriction.

(b) A restriction on the transfer or registration of transfer of shares is valid and enforceable against the holder or a transferee of the holder if the restriction is authorized by this section and its existence is noted conspicuously on the front or back of the certificate or is contained in the information required by § 48-16-207(b). Unless so noted, a restriction is not enforceable against a person without knowledge of the restriction.

(c) A restriction on the transfer or registration of transfer of shares is authorized:

(1) To maintain the corporation's status when it is dependent on the number or identity of its shareholders;

(2) To preserve exemptions under federal or state securities law; or

(3) For any other reasonable purpose.

(d) A restriction on the transfer or registration of transfer of shares may;

(1) Obligate the shareholder first to offer the corporation or other persons (separately, consecutively, or simultaneously) an opportunity to acquire the restricted shares;

(2) Obligate the corporation or other persons (separately, consecutively, or simultaneously) to acquire the restricted shares;

(continued...)

Tenn. Code Ann. § 48-16-208(b)(2002). Like most jurisdictions, Tennessee's statutes reflect a dramatic change from the traditional notion that a "stockholder has perfect ownership over his stock and may sell, assign, pledge, or otherwise dispose of it as he pleases and the corporation is bound to honor his acts in regard thereto." *Johns v. Caldwell*, 601 S.W.2d 37, 42 (Tenn. Ct. App. 1980)(citing *State ex rel Lowell Wiper Supply Co. v. Helen Shop, Inc.*, 211 Tenn. 107, 362 S.W.2d 787 (1962)).

In this case it is undisputed that the Loan Agreement contained a restriction on the transfer of the stock. Section 4.3 of the Agreement states the following:

> Limitation on Transfer of Stock of Borrower or Issuance of Stock.
> Neither Borrower nor any other person or entity who may now or hereafter own any of the capital stock of Borrower, transfer, pledge or encumber any of the capital stock of Borrower, nor may Borrower issue any new capital stock, nor may any ownership interest in Borrower change in any other way, without obtaining Millers' prior written consent (with a separate consent being required for each such sale, transfer, pledge, encumbrance, or issuance of stock, or any other change of ownership interest), which consent will not be unreasonably withheld.

Nevertheless, at trial, the Baughs presented what both parties concede was a draft ("the Draft") of their alleged agreement. The Baughs entered the Draft into evidence to prove the terms of the contract. Despite the Baughs' contention on appeal that they merely sold one-half of their interest in the stock to the Novaks, we find that the plain language of the agreement was to sell fifty percent of the stock. The Draft states the following:

> WHEREAS, Baugh is the sole shareholder of Precision Services, Inc. formerly Temporary Optics, Inc. ("Precision"), being the owner of 1,000 shares of outstanding Capital Stock of Precision; and
> WHEREAS, Novak has offered to purchase and Baugh has agreed to sell one-half (½) of the outstanding Capital Stock of Precision being 500 shares; and WHEREAS, Novak has agreed to pay and Bough has agreed to accept the sum of Seventeen Thousand and 00/100 Dollars ($17,000.00) for the purchase of said Stock to be evidenced by a Promissory Note of Novak payable to Baugh . . .

---

[1](...continued)

    (3) Require the corporation, the holders of any class of its shares, or another person to approve the transfer of the restricted shares, if the requirement is not manifestly unreasonable; or

    (4) Prohibit the transfer of the restricted shares to designated persons or classes of persons, if the prohibition is not manifestly unreasonable.

    (e) For purposes of this section, "shares" includes a security convertible into or carrying a right to subscribe for or acquire shares.

Tenn. Code Ann. § 48-16-208 (2002).

In addition, the Stock Purchase Agreement warranted that there were no restrictions upon the transfer of the shares of stocks and that the Baughs had the right to transfer the shares free of any encumbrances. Nevertheless, Mr. Baugh testified at trial that he knew that the he needed the consent of the Millers to transfer Precision stock to the Novaks. Mr. Baugh's testimony was as follows:

> [Mr. BAUGH]: So this document required the consent of the Millers. So I sent a letter to the Millers asking for their consent. I told them the benefits to the company, that it would be good to have an engineer that had significant sales experience to become a 50 percent owner of the business.
>           The Millers responded - - their attorney responded by letter and said that he wanted to see financial statements on Mr. Novak and - -
>
> BY MR BAYDOUN:
>
> Q.      Were you asking them to release you from the guaranty or anything like that?
>
> A.      No.
>
> Q.      They were just getting another guarantor, right?
>
> A.      Didn't even get that far.
>
> Q.      Okay.
>
> A.      I called the Millers' attorney and spoke with him. I asked him why he needed financial statements. They already had my guaranty. He said that they wanted to know who they were dealing with and they wanted - - that they were going to want his guaranty. They wanted to know the purchase price. They wanted to know all of these details about the transaction.
>           The Millers were extremely, extremely difficult to deal with in every single instance that we had with them.
>
> Q.      And did you want to burden Mr. - -
>
> A.      Well, I didn't want - - at every point they were trying to reach into our back pockets. I didn't want them to have additional guarantees from Mr. Novak.
>
> Q.      You just wanted him to be obligated to you for having them?

A. Correct. I mean, as long as I felt safe that, you know, we were both on the note or that we would split any liabilities, then that seemed to me to be a much better way to go.

Q. Okay.

A. So when going this route became very complicated and the Millers wanted more collateral in terms of guarantees, I called Sam McAllester. I said, Sam, here is what we want to accomplish. I want Herman to have the rights of 50 percent of the stock and I want Herman to indemnify us on any of the obligations for Precision, and we want to be 50/50 partners all the way down the line.
    So Sam McAllester drafted the stock purchase agreement, the indemnity agreements, all of the documents that would be necessary to transfer the stock without the Millers' consent.

Q. And that's how you came by the indemnity agreement?

A. Correct.

The Baughs conceded at trial, therefore, that whatever agreement they may or may not have made with the Novaks was supposed to bypass the stock transfer restriction in their contract with the Millers. In light of the clear legislative policy permitting parties to reasonably restrict stock transfers, it is our determination that the purported contract between the Baughs and the Novaks is unenforceable on public policy grounds. We find that the purported agreement undermines the purpose of Tennessee Code Annotated § 48-16-208, and we believe that enforcement of a contract created to bypass such restrictions violates the public policy of this state. *See Mattox v. Loretto Fin. Servs.*, No. 01A01-9307-CV-00308, 1994 WL 698046, at * 3–5 (Tenn. Ct. App. Dec. 14, 1994). In accord with prior case law, we find such impropriety to be clear and inherent from the purported contract language. *Id.* at *5.

As we have previously articulated, where we find that a contract is unenforceable we generally leave the parties in the position where we find them and refuse to aid either party. *Ledbetter v. Townsend*, 15 S.W.3d 462, 465 (Tenn. Ct. App. 1999). Doing so in this case, we reverse the trial court's determination that the Novaks must indemnify the Baughs pursuant to the contract. In light of our determination that the parties' stock transfer and indemnity agreement is unenforceable on public policy grounds, it is unnecessary for us to address Plaintiffs' remaining issues. We remand this case to the trial court for entry of judgment consistent with this opinion.

### *Conclusion*

In light of the foregoing, we affirm in part and reverse in part. We affirm the trial court's judgment with respect to its determination that the statute of frauds did not render the agreement

-11-

enforceable and its decision to admit parol evidence to establish the terms of the agreement.  We find, however, that the contract was unenforceable as a matter of public policy and reverse the trial court's award of damages to the Plaintiffs.  Costs of this appeal are taxed one-half to the Appellees, Wendell P. Baugh, III and Laura W. Baugh, and one-half to the Appellants, Herman Novak and Faith Novak and their surety, for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE
