IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2000 Session

## AUDREY J. OWEN v. WILLIAM C. MARTIN, III

**Appeal from the Chancery Court for Davidson County**
**No. 98-374-III     Ellen Hobbs Lyle, Chancellor**

---

**No. M1999-02305-COA-R3-CV - Filed December 13, 2000**

---

The trial court found that a mother and her adult son had both breached an oral contract whereby the son agreed to pay off the mortgage on his mother's home and to permit her to remain there for the rest of her life, and the mother agreed to give the son her equity in the home upon her death, and to allow him to use a garage apartment in the home until that time. We reverse the trial court's finding that there was an enforceable contract between the parties, but we impress a resulting trust on the son's interest in the home, which inures to his mother's benefit.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part; and Remanded

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

B. Lynn Morton, Clarksville, Tennessee, and Branch H. Henard, Nashville, Tennessee, for the appellant, William C. Martin, III.

R. Price Nimmo and Rabin P. Nimmo, Nashville, Tennessee, for the appellee, Audrey J. Owen.

### OPINION

### I.

In 1976, Audrey Owen and her husband Roy purchased a three-bedroom, two-bathroom home at 2800 Noonan Drive in Davidson County. They eventually paid off their mortgage. In 1989, they borrowed over $60,000 against the value of the house. Ms. Owen used $30,000 of the loan proceeds to purchase a square dance apparel business knows as the Flutter Wheel. Shortly thereafter, Roy Owen stopped contributing financially, and he eventually left the marital home.

The Flutter Wheel did not prove to be a profitable business. Ms. Owen developed heart problems, and she found herself physically unable to attend square dances to sell her products. As her financial condition worsened, Ms. Owen stopped paying the property taxes and mortgage

payments on her home. In 1992, the mortgage-holder threatened to foreclose on the property if past-due payments were not made. Ms. Owen decided to sell the property, and she and Roy signed a contract to have it auctioned off. She asked to be released from the contract after one of her sons, William Martin, offered to help her with the mortgage payments.

Mr. Martin had moved to Cincinnati in 1988, but he often came to Nashville to exercise weekend visitation with his two young sons, who lived in the area with his ex-wife. When he returned, William Martin sometimes stayed with his children in a motel, sometimes with friends, and sometimes in his mother's house. According to Mr. Martin, it was difficult for him and his children to stay in his mother's home because of her difficult and demanding personality. Mr. Martin was exploring the possibility of purchasing a condominium in Nashville for the purpose of visitation, when he learned of his mother's dilemma.

Mr. Martin abandoned his plan to buy the condominium, and he agreed to help his mother with the payments on her home, in the expectation that while helping her he could also create a private and comfortable space for himself and his children. He planned to improve and furnish an apartment in the Noonan Drive home that had been carved from a two-car garage and an adjoining bathroom and laundry room.

After ascertaining that Ms. Owen's equity in the house comfortably exceeded the obligation on the mortgage, Mr. Martin allowed the home to go into foreclosure, and on January 12, 1993, Mr. Martin purchased it from the mortgage holder at a foreclosure sale. Mr. Martin paid off the back taxes, made a $16,000 down payment against the purchase price of $62,088, and financed the rest through a new mortgage.

He allowed his mother to continue living in the home as he made the mortgage payments, but she resisted his attempts to create a habitable space for himself and his children. Despite her supposedly frail physical condition, she somehow managed to move desks, a tanning bed, a treadmill and surplus furniture into the apartment while Mr. Martin was away in Cincinnati. She kept her dogs, who were not house-trained, in the laundry room. She also stored the Flutter Wheel inventory of shoes, blouses, shirts, skirts and petticoats in the apartment, until she agreed to let Mr. Martin sell it, so he could finance some needed improvements to the home. He realized $3,000 by selling the inventory to a liquidator.

By 1997, Mr. Martin understood that the space-sharing arrangement would never work, and he asked his mother to begin making the monthly payments on the mortgage. She refused, and after a heated confrontation with his mother and his brother, he sent her a letter giving her the option of moving into the garage apartment while paying $250 a month rent, and letting him rent out the rest of the house, or vacating the house so he could sell it. She did not respond.

## II. PROCEEDINGS IN THE TRIAL COURTS

On January 21, 1998, Mr. Martin filed a detainer warrant against his mother in the Davidson County General Sessions Court. Ms. Owen responded on February 6, 1998, by filing a complaint

in Chancery Court, in which she asked the court to issue a Temporary Restraining Order to prevent Mr. Martin from disturbing her possession of the property. She also asked the court to declare a constructive or resulting trust on the property in her favor, or in the alternative, to order it sold, with her to receive all the equity plus over $23,000 for the value of the Flutter Wheel inventory.

On February 27, 1998, the general sessions court awarded Mr. Martin possession of the home. Ms. Owen appealed from that decision to the circuit court. The circuit court subsequently granted Ms. Owen's motion to transfer the case to chancery court, where it was consolidated with the action pending there. The trial of the case began on August 2, 1999. After hearing testimony from Ms. Owen, Mr. Martin, Mr. Martin's brother and five other witnesses, the trial court found that the parties had entered into an enforceable oral contract, which both had breached.

The court awarded Mr. Martin possession of the house, and ordered Ms. Owen to move out on or before September 15, 1999. Mr. Martin was also ordered to pay a money judgment of $38,911 to Ms. Owen. Three thousand dollars of that judgment represented the amount that Mr. Martin realized from the sale of the square dance inventory, and $35,911 represented her equity in the house, calculated as the difference between the appraised value of the house in 1993, and the amount Mr. Martin paid for the house following foreclosure. On November 17, 1999, the trial court denied Mr. Martin's Motion to Alter or Amend the Judgment. This appeal followed.

### III. ORAL CONTRACT
#### A. A MEETING OF THE MINDS?

We may find the actions of a son who evicts his mother from a home she lived in for more than twenty-one years to be deplorable, but the responsibility for this unfortunate turn of events does not entirely rest upon Mr. Martin's shoulders. If Ms. Owen had been willing to share the house on Noonan Drive with her son and her grandchildren, in a manner consistent with their needs, she would probably still be living there. In any case, our job is not to intervene in a complex family situation in order to compel human beings to behave better, but merely to review the actions of the trial court to determine if it has applied the law correctly.

The court found that the parties had formed an enforceable oral contract, which both had breached. Because of discrepancies between the parties' respective accounts of the nature of their agreement, the court had to piece together portions of their testimony and to add at least one provision of its own devising in order to arrive at the terms of the purported contract.

According to the court, Mr. Martin agreed to permit his mother to remain in the home during her lifetime, "that she would have, in essence, a life estate," and that he would pay off the mortgage, and not allow the home to go into foreclosure. Ms. Owen purportedly agreed to give up the title and equity in the home to Mr. Martin, to allow him to remodel the garage apartment for visitation with his children, and to contribute her Flutter Wheel inventory to the payoff on the home, as a quid pro quo for the life estate.

While such an agreement might have given Ms. Owen and Mr. Martin an equitable way to share their resources in order to meet their respective needs, the testimony of both parties is inconsistent with the terms of the contract described by the trial court. Ms. Owen denied that she agreed to let her son have exclusive use of the garage apartment. Instead, she testified that Mr. Martin simply promised to pay off the mortgage and allow her to live in the house, and that she in return, promised to give him the inventory of the Flutter Wheel and her equity in the home upon her death. Mr. Martin denied that the equity in the home or the Flutter Wheel inventory were ever discussed or included in the deal. Neither party testified that the question of foreclosure formed any part of their agreement.

It is an axiom of contract law that while it is within the province of the court to interpret or construe a contract entered into by the parties before it, the court has no right to make a new contract for parties that they did not make for themselves. *Central Adjustment Bureau v. Ingram*, 678 S.W.2d 28 (Tenn. 1984)*; Bob Pearsall Motors Inc., v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975); *Bank of Maryville v. Topping*, 393 S.W.2d 280 (Tenn. 1965); *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955).

An oral contract may be enforced (unless it is of a type prohibited by law), but only if it can be shown that there was a meeting of the minds, and that both parties have mutually assented to its terms. *Castelli v. Lien*, 910 S.W.2d 420 (Tenn. Ct. App. 1995); *Computer Shoppe v. State*, 780 S.W.2d 729 (Tenn. Ct. App. 1989). In the present case, there is no showing that the parties' minds ever met on the terms of the purported contract, or that they gave their mutual assent to the agreement described by the court. We have no doubt that the trial court was well-intentioned in declaring the parties to have reached the agreement described above, but it exceeded its powers in trying to create a contract for the parties that they did not create for themselves.

## B. THE STATUTE OF FRAUDS

Even if we were to conclude, however, that the minds of the parties met on the contract described by the court, such a contract would still be unenforceable, because it was not evidenced by a signed memorandum, as required by the Statute of Frauds. The statute is a law of venerable origins which is found in our legal code at Tenn. Code. Ann. § 29-2-101. The relevant portions of the statute read,

No action shall be brought:

. . .
(4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year;
. . .
unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

-4-

The prohibition against enforcing oral contracts for the "sale of lands, tenements or hereditaments" actually extends to many types of transactions involving land, including mortgages, *Lambert v. Home Federal Savings & Loan Ass'n*, 481 S.W.2d 770 (Tenn. 1972), and options to sell real property, *GRW Enterprises v. Davis,* 797 S.W.2d 606 (Tenn. Ct. App. 1990). More relevant for our purposes, a life estate in land cannot be created, reserved, relinquished, conveyed or sold by parol. *Webb v. Shultz,* 198 S.W.2d 333 (Tenn. 1946).

The trial court attempted to circumvent the Statute of Frauds by concluding that the contract was enforceable because it had been partially performed. It appears to us, however, that Mr. Martin was the only party who performed any part of the supposed agreement, and he is not the one who is seeking to enforce the purported contract. In any case, it has long been the rule in this state that partial performance will not prevent the application of the Statute of Frauds to an agreement involving interests in real estate. *Knight v. Knight*, 436 S.W.2d 289 (Tenn. 1962); *Eslick v. Friedman*, 235 S.W.2d 808 (Tenn. 1951); *Goodloe v. Goodloe*, 92 S.W. 767 (Tenn. 1905).

## IV. A RESULTING TRUST

In order to support its theory of contract, the trial court found that Mr. Martin had promised not to allow the house to go into foreclosure. As we noted above, there is absolutely no testimony in the record to support such a conclusion. We do not impute any ill motive to Mr. Martin's decision to buy the house at foreclosure rather than making payments on Ms. Owen's current mortgage, as she assumed he would do. We believe rather that he wanted to make sure that he would ultimately acquire a clear title to the house, rather than one encumbered by the marital interest of Ms. Owen's estranged husband, Roy.

In acquiring clear legal title to the home, however, Mr. Martin did not thereby erase Ms. Owen's equitable interest in the property. That interest can be protected by the use of a resulting trust. A resulting trust arises from the expressed intent of the parties. It can be declared by the court in situations where the acts or expressions of the parties indicate that a relationship of trust arises from their transaction, and the impression of a trust upon the property they have been dealing with fulfills the intent they have expressed. A resulting trust may be proven by parol evidence, though proof of a parol trust must meet a higher standard than a mere preponderance of the evidence. *See generally*, 72 Am.Jur.2d *Trusts* § 163 (1992).

In the present case, Mr. Martin acknowledged that he promised his mother that he would help her keep her home, and that he would deal with the mortgagee, who was threatening to foreclose if she did not pay the mortgage arrearage. For her part, Ms. Owen relinquished control of that portion of her financial affairs to her son, in the belief that he would take care of her housing needs.

The creation of what appears to be a confidential relationship between the parties, and a promise by one to take care of the housing needs of the other (in this respect, their testimony is consistent) creates an appropriate situation for the imposition of a resulting trust: "Resulting trusts are those which arise where the legal estate is disposed of, or acquired, without bad faith, and under such circumstances that Equity infers or assumes that the beneficial interest in said estate is not to

go with the legal title," *Roach v. Renfro*, 989 S.W.2d 335, 340 (Tenn. Ct. App. 1998), quoting Gibson's Suits in Chancery § 382 (6th Ed. 1982).

It thus appears to us that Mr. Martin acquired the equity in the house on Noonan Drive subject to the beneficial interest of Ms. Owen, and that the equity must inure to her benefit. The record indicates that Ms. Owen has already moved from the Noonan Drive home, so Mr. Martin's obligation must be directed towards meeting the expenses at her current residence.

In order to accomplish the purpose of the trust (providing shelter to Ms. Owen from the proceeds of her interest in her former residence), we find that Mr. Martin must make monthly payments to Ms. Owen in an amount measured by the rental value of the house on Noonan Drive without the garage apartment. Mr. Martin has already testified that the house, if undivided, could rent for $750 or $800 per month, but we have seen no testimony as to how much less it would be likely to bring after being divided. We remand this case to the trial court for further proof, to determine the correct amount.

## V. The Flutter Wheel Inventory

Mr. Martin sold the square dance inventory (which from his point of view might more appropriately be called "the Clutter Wheel") partly as a service to his mother, and partly to create some room in the garage apartment. He has asserted no claim upon the proceeds. While Ms. Owen claimed that the inventory was worth what it cost her to acquire it, $23,000, there is no evidence in the record to indicate that sale of the assorted blouses, skirts, petticoats, shoes, shirts, and other square dance paraphernalia could have produced a greater return than Mr. Martin was able to sell them for. We therefore affirm that part of the trial court's judgment that awarded Ms. Owen $3,000 for her interest in the Flutter Wheel.

## VI.

The judgment of the trial court is reversed in part and affirmed in part. Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal equally between the appellant and appellee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.