IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2005 Session

## BEVERLY C. SMITH v. RONNIE R. SMITH, ET AL.

**Appeal from the Chancery Court for Wilson County**
**No. 02402      Charles K. Smith, Chancellor**

---

### No. M2004-00257-COA-R3-CV - Filed November 22, 2005

---

This case involves an intrafamily transaction in real property. A now-deceased owner of a piece of commercial property held by tenancy by the entireties agreed to sell it to his nephew in a handshake transaction. The nephew made a $10,000 down payment, began paying off the balance in monthly installments, and made improvements to the property. After the seller died, his widow filed a complaint for declaratory judgment asking the court to declare the rights of the parties with regard to the real property. Although the trial court found there was indeed an agreement between the uncle and the nephew to sell the land to the nephew, the court declined to require the widow to effectuate the contract, not because she had not agreed to the sale, but because she offered to reimburse the nephew for all his out-of-pocket costs. Because we conclude the widow should be estopped from asserting the statute of frauds to avoid the sale, and because her offer cannot limit the buyer's remedies, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

August C. Winter, Brentwood, Tennessee, for the appellants, Ronnie R. Smith and Betty Jo W. Smith.

James M. Lea, Jr., Robert Evans Lee, Lebanon, Tennessee, for the appellee, Beverly C. Smith.

### OPINION

### I.

In 1982, Benton Smith purchased a small piece of commercial property located at 14111 Lebanon Road in the Hermitage area of Wilson County, Tennessee. The warranty deed stated that the property was being conveyed to "Benton M. Smith and wife, Beverly C. Smith, as tenants by the

entireties." The proof showed that Mr. Smith bought and sold rental property for investment purposes and that he had purchased ten or twelve such properties in Tennessee and Kentucky during his twenty-one year marriage to Beverly Smith. Mr. Smith dealt with the investment real property, and Mrs. Smith generally did not wish to involve herself in the transactions or assume responsibility for management or ownership of the properties. During the marriage, Mr. Smith generally made decisions concerning the real property he owned prior to the marriage[1] as well as the property acquired after the marriage.

There was a building on the property in question that was divided by a common wall into two sections. Ronnie Smith, Benton Smith's nephew, moved his home repair and painting business into the smaller A side. Randy Dillingham, Beverly Smith's son by an earlier marriage, moved his automotive body shop business into the larger B side. Ronnie Smith and Randy Dillingham both paid monthly rent to Benton Smith, with Ronnie Smith apparently paying $500 per month.

In the year 2000, Benton Smith decided to sell some of his holdings, including the Lebanon Road property. He told both Ronnie and Randy of his plans, and encouraged them to buy the property. Randy went to the bank, but was unable to obtain the necessary financing. Ronnie owned a duplex that he could use as collateral, so the bank agreed to finance his purchase.

In June of 2000, Benton Smith agreed to sell the property to Ronnie Smith for $140,500. Because the bank rate for loans on commercial property was twelve percent, Benton Smith offered to finance the purchase himself, at a lower interest rate. Ronnie gave Benton Smith a check for the $10,000 down payment and agreed to pay him $1,500 per month on the balance. Ronnie also started paying the property taxes and the insurance.

Ronnie Smith subsequently informed Randy Dillingham about the transaction and presented him with a lease, dated July 1, 2000, which Randy signed. The lease required Randy to pay rent of $1,000 per month to Ronnie for the B side of the property, an increase over the $600 per month which he had been paying to Benton Smith. About six months after he bought the property, Ronnie decided to build an addition onto the A side of the building and rent it out to a used car dealer. He spent about $21,000 on the materials for the addition.

Benton Smith did not reduce the parties' agreement to writing at the time of sale. According to Ronnie Smith, Benton Smith only wanted a handshake agreement because his motto was "A man's word is only as good as he is." In early 2001, Ronnie asked his uncle to write out the details of their agreement for use in preparing his tax return. Benton Smith wrote out a document in his own hand, the content of which was as follows:

---

[1] Prior to their marriage, Benton Smith and Beverly Smith entered into a prenuptial agreement which established real property owned by him at the time of the marriage as his separate property.

**14111 Leb. Rd**.

| | |
|---|---|
| Bought July 2000 | $140,500 |
| Down Payment | 10,000 |
| | $130,500 |
| (5) payments made $1500 of which $4,661,65 was Interest and remaining $2,878.35 Applied to deducted principal | $ 2,878.65 |
| Balance End year 2000 | $127,621.35 |

Ronnie went to Benton Smith's house to pick up the document. When he arrived, Mr. Smith was in the shower. Ronnie told Beverly Smith why he had come, and she retrieved the document and gave it to him.

In early November of 2001, Ronnie Smith had a warranty deed and deed of trust prepared.[2] Ronnie testified that he, Benton Smith, and Beverly Smith went to the bank to execute the deeds,[3] and to have their signatures notarized. However, the bank was closed, and the deeds were never executed.

Apparently unexpectedly, Benton Smith died in the hospital on November 20, 2001. He did not leave a will. By her own account, Beverly Smith was distraught and confused following her husband's untimely death. Ronnie Smith and Randy Dillingham both realized that Benton Smith's death left the title to the property they occupied unsettled, and they began to position themselves to establish or protect their interests in the disputed property.

According to Ronnie Smith's testimony, he asked Beverly Smith to sign the warranty deed, and she was willing. However, Randy and his brother Brian subsequently advised her not to sign anything, so when she went to the attorney's office, she declined. Randy Dillingham consulted with an attorney who advised him to start paying rent to Beverly Smith instead of to Ronnie. Randy began making those payments in January of 2002. When Ronnie asked him for the rent, Randy told him that he was sending it to his mother instead. Ronnie then began sending $500 checks each month, which were made out to the Estate of Benton Smith.

## II. TRIAL PROCEEDINGS

On November 27, 2002, Beverly Smith filed a lawsuit in the Chancery Court of Wilson County, seeking a declaratory judgment of the rights of the respective parties to the disputed

---

[2]The timing is evidenced by an invoice from the attorney who prepared the documents which was dated November 2, 2001.

[3]Other testimony indicates the document to be signed that day was a promissory note. Of course, a promissory note could have been one of the documents included in the transaction since Benton Smith had financed the purchase.

property. Ronnie Smith answered and also asked for a declaratory judgment as to the rights of the parties in the property.[4]

The hearing was conducted on November 17, 2003. Apart from Beverly Smith and Ronnie Smith, seven other witnesses testified, all of whom were relatives of the parties. During opening statements, Beverly Smith's attorney announced that if the court declared her to be the rightful owner of the property, she was willing to reimburse Ronnie Smith for all the out-of-pocket costs he incurred on the property, including those for the improvements he made.

The documentary evidence that was introduced at trial included Benton Smith's handwritten memorandum of the parties' agreement, a cancelled check for $10,000, dated June 30, 2000, made out by Ronnie Smith and payable to the order of Benton Smith, with a notation on the memo line, "Payment on 14111 Leb Rd A & B side," 16 checks for $1,500 each, with similar notations on the memo line, Ronnie Smith's checks in payment of insurance and property taxes, the lease signed by Randy Dillingham, and various receipts for materials used in the construction of the addition to the A side.

Ronnie Smith testified that Beverly Smith was present when he and Benton Smith entered into their agreement on the property and that she was sitting on the couch beside him, while Benton Smith was sitting in his recliner. According to Ronnie, Mrs. Smith did not object to the sale; instead, she said that she thought it would be the best thing because now she wouldn't have to collect the rent from Randy anymore. She also made Ronnie promise that if he ever decided to sell the property, he would give Randy the first chance to buy it. Beverly Smith herself testified that she and her husband sometimes had problems collecting the rent from Randy Dillingham when he was still paying them directly. Another witness testified that Beverly Smith had later stated that she was glad they had sold the property since she no longer had to get Randy to pay the rent.

Beverly Smith was questioned closely about her understanding of the events surrounding the sale of the disputed property. She insisted that she knew nothing about the nature of the transaction, responding "not to my knowledge" to numerous questions. She testified that her late husband made his own decisions about his real estate investments. She admitted that she knew that Ronnie Smith was making improvements to the property. Asked about whether she knew that her son had signed a lease with Ronnie, she answered, "I didn't know about it, I knew that was kind of like guy things." In later questioning, she admitted that she knew that Randy had signed a lease with Ronnie, but claimed not to know why he had done so. When questioned about her presence at the time her husband and Ronnie were discussing the sale, she remembered being there, but testified that she "didn't get into their conversation that much."

---

[4]The answer and appeal also name Ronnie Smith's wife, Betty Jo Smith, as a party, presumably because she was to be listed on the deed and/or was a co-owner of the property with her husband. For the sake of simplicity, our references to Ronnie Smith as the purchaser or owner of the property and as a party to the lawsuit should be read to include Betty Jo Smith.

However, several other witnesses testified as to discussions with Beverly Smith which contradicted her claim to be completely unaware that Ronnie Smith had purchased the property. For example, Ann Fuqua, Benton Smith's sister, testified that she had talked to Beverly Smith three or four times about getting the papers in order after Ronnie Smith bought the property, and that Beverly Smith had stated that Ronnie had nothing to worry about, because she (and her husband before his death) did not intend to cheat him out of the place. Sherry Green, Benton Smith's daughter, testified that Beverly Smith had told her that Benton Smith had fallen on the way back from an unsuccessful trip to the bank to get a promissory note notarized on the property. Beverly Smith had testified that she remembered going to the bank to get something signed that day, but claimed that she did not know what it was.

The court entered an order on December 15, 2003, that simply held, without elaboration, that the property in question was the sole and separate property of Beverly Smith. The order also awarded a judgment to Ronnie Smith and Betty Jo Smith in the amount of $47,664.12. All the costs incurred by Ronnie Smith related to his purchase of the property were listed and were included in that amount, including the down payment, payments made in excess of the previous rent payment, insurance, Wilson County property taxes, the water bill, materials purchased for the addition to the A side of the building, and the value of the labor Ronnie Smith expended in building the addition.

Although the order does not explain the trial court's reasoning, the court's findings and statements at the end of the trial, placed in the context of the parties' arguments, illuminate the basis for the ultimate holding. At one point, the court noted that there was ample evidence of a sales agreement between Benton Smith and Ronnie Smith:

> It's obvious, and I don't think it can be questioned in my opinion, he has an agreement with Mr. Smith. I really – that is so obvious to me, but again –and you don't even have to prove that to me any more. I'm satisfied. I'm really satisfied about that, that there was an agreement, it's in his handwriting, and Mr. Smith had agreed to sell him this property.

Although the proof included the handwritten note detailing the transaction and payments to date, as well as checks evidencing payment consistent with the terms shown in the memorandum, there was no document about the transaction containing the signature of either Mr. Smith or Mrs. Smith. Consequently, Ronnie Smith conceded there was no writing evidencing the agreement to sell that met the requirements of the Statute of Frauds. Absent proof to establish a legal reason to avoid application of the Statute of Frauds, the court noted, Mrs. Smith became the fee simple owner of the property at her husband's death.

While the court felt there was enough evidence to estop Mr. Smith from denying the sale had he survived, it at least initially found the question of whether Mrs. Smith was similarly estopped

more difficult.[5]  While the trial court never made an express finding as to whether the proof showed conduct by Mrs. Smith that justified application of the doctrine of equitable estoppel, it implied that it would have made such a finding if Mrs. Smith had not offered to reimburse Ronnie Smith for expenses he incurred on the subject property.  The court determined that Mrs. Smith's announced willingness to make Ronnie Smith whole precluded the application of equitable estoppel.  After identifying and totaling the expenses to be reimbursed, which became the amount of a judgment against Beverly Smith, the court stated:

> All right, that's my judgment for you from her.  And I'm sorry I can't make both of you exactly whole.  I just - -  this is a hard case.  It's got a lot of interesting twists in it.  It's strange, and I told you the reason I didn't apply equitable estoppel is because she wanted to make him whole and **I felt like if she had not taken that move that equitable estoppel would have applied and he could have gotten the property**, but she says I'm not going to let him be hurt, I'm going to give him back everything that he was out.

Ronnie Smith was dissatisfied with this resolution because he wanted the land he had agreed to purchase, and he filed an appeal.

### III. APPLICABLE LEGAL PRINCIPLES

As stated above, the deed by which Benton Smith first procured the property conveyed it to "Benton M. Smith and wife, Beverly C. Smith, as tenants by the entireties." Such a tenancy is a form of property ownership unique to married persons. *Griffin v. Prince,* 632 S.W.2d 532, 534 (Tenn. 1982); *Catt v. Catt,* 866 S.W.2d 570, 573 (Tenn. Ct. App.1993).

In a tenancy by the entireties, each spouse is considered to be the owner of the entire property rather than of a share or a divisible part of it. *Grahl v. Davis*, 971 S.W.2d 373, 378 (Tenn. 1998); *Sloan v. Jones*, 241 S.W.2d 506, 507 (Tenn. 1951).  Upon the death of one spouse, the surviving spouse retains his or her ownership of the property, without being subject any longer to the undivided interest of the deceased spouse.  In other words, the surviving spouse is then deemed to possess the property in fee simple absolute. *Heirs of Ellis v. Estate of Ellis*, 71 S.W.3d 705, 712 (Tenn. 2002).

A corollary to this form of ownership is that one spouse cannot dispose of the  property without the consent of the other, but can only transfer or encumber his or her right of survivorship. *In re Crum,* 81 S.W.3d 764, 770 (Tenn. 2002); *Robinson v. Trousdale County,* 516 S.W.2d 626, 632 (Tenn. 1974).  One of the purposes of a tenancy by the entireties is to protect each spouse's interest

---

[5]Ronnie Smith argued that the widow, Beverly Smith, should be equitably estopped from relying on the Statute of Frauds to avoid the sale because of her knowledge of and acquiescence to it.  At one point, the trial court observed that the only way that any agreement to sell could be attributed to Mrs. Smith was through her silence during the initial discussion, her knowledge of the improvements, her expressed relief at not having to attempt to collect rent from her son after the sale, and various post-transaction statements she made to other people.

in marital property from unilateral acts by the other spouse. *See* 4 THOMPSON ON REAL PROPERTY §§ 33.03 and 33.06, Thomas Edition (David A. Thomas, ed. 1994).

Consequently, upon the death of Benton Smith, Beverly Smith, as the surviving spouse, became the presumptive owner of the property at issue. Other legal principles, however, must be taken into consideration to determine her right to retain or refuse to transfer the property. As the trial court recognized, those principles are the Statute of Frauds and the related doctrine of equitable estoppel.

The Statute of Frauds is a venerable rule of law[6] that requires that certain types of contracts be in writing in order to be enforceable. *Shedd v. Gaylord Entertainment Co.*, 118 S.W.3d 695, 697 (Tenn. Ct. App. 2003). The purposes of the Statute of Frauds have been variously described as (1) "to reduce contracts to a certainty, in order to avoid perjury on the one hand and fraud on the other," *Baliles v. Cities Service Co.*, 578 S.W.2d 621, 623 (Tenn. 1979), quoting *Price v. Tennessee Products & Chemical Corporation*, 385 S.W.2d 301, 308 (Tenn. 1964); (2) to avoid misunderstandings about the terms and nature of those contracts, *Cunningham v. Lester*, 138 S.W.3d 877, 880 (Tenn. Ct. App. 2003); *Johnson v. Haynes,* 532 S.W.2d 561, 565 (Tenn. Ct. App. 1975); and (3) to "avoid basing certain types of agreements on faulty memories." *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 611 (Tenn. Ct. App. 1990).

Tennessee's Statute of Frauds provides, in pertinent part, that,

> no action shall be brought . . . [u]pon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Tenn. Code Ann. § 29-2-101(a).

The requirement that the memorandum be signed is meant to guarantee that the seller has given his assent to the agreement. *Cunningham v. Lester,* 138 S.W.3d 877, 881 (Tenn. Ct. App. 2003); *Massey v. Hardcastle*, 753 S.W.2d 127, 137 (Tenn. Ct. App. 1988). As Ronnie Smith has conceded, the evidence in the case before us does not include a writing signed by Benton Smith or Beverly Smith that could be construed as meeting the requirements of the Statute of Frauds.

However, the purpose of the Statute of Frauds is not to allow a party to avoid agreements he or she has made. *Cobble v. Langford*, 190 Tenn. 385, 390, 230 S.W.2d 194, 196 (1950). It has long been recognized in our courts that strict application of the Statute of Frauds can lead to evils as

---

[6] Tennessee's Statute of Frauds (as well as those of other states) is patterned after an English Law which was enacted in 1677, as "the Statute for the Prevention of Frauds and Perjuries." *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 932 (Tenn. Ct. App.1984).

undesirable as those it was designed to limit or prevent. *Southern States Development Co., Inc. v. Robinson,* 494 S.W.2d 777, 781 (Tenn. Ct. App. 1972). Consequently, it "should not be used to avoid contracts or to grant a privilege to a person to refuse to perform what he has agreed to do." *GRW Enterprises, Inc.*, 797 S.W.2d at 611, quoting *Cobble*, 190 Tenn. at 390, 230 S.W.2d at 196. Neither should its enforcement render it "an instrument of hardship and oppression." *Id.*, citing *Baliles*, 578 S.W.2d at 624.

In order to prevent such results, our courts have held that in some circumstances a party is estopped to assert the Statute of Frauds to avoid contractual undertakings in the interest of equity and fairness.[7] Estoppel based on principles of equity may be applied in a number of situations, including to preclude assertion of the Statute of Frauds to avoid an agreement to transfer real property, and is generally described as:

> . . . the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Beazley v. Turgeon,* 772 S.W.2d 53, 58 (Tenn. Ct. App. 1988), quoting *Church of Christ v. McDonald,* 171 S.W.2d 817, 821 (Tenn. 1943). The purpose of equitable estoppel and its objective are:

> . . . to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Baliles*, 578 S.W.2d at 624.

As these descriptions make clear, whether a party should be estopped depends upon the totality of the factual situation. In the case before us, the trial court determined that if Benton Smith had become the surviving spouse, he would have been estopped from using the Statute of Frauds to avoid his agreement to sell the property to Ronnie Smith. As the trial court recognized, the question, however, is whether Beverly Smith, the actual surviving spouse, is entitled to rely on the Statute of Frauds or whether she should be estopped from such reliance because of her own conduct.

---

[7]The Statute of Frauds merely makes a contract unenforceable, not void, and its requirements may be waived. *Cobble*, 190 Tenn. at 390, 230 S.W.2d at 196 (Tenn. 1950); *Brakefield v. Anderson*, 87 Tenn. 206, 208-10, 10 S.W. 360 (1889).

Additionally, the parties have raised the issue of whether specific performance is warranted, a question that arises only if it is determined that the agreement is enforceable.

## IV. ANALYSIS

As described above, the general requirements for reliance on equitable estoppel are conduct by the party to be estopped that is relied upon by the other party, leading him to change his position. In most situations,

> The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:
>
> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.
>
> Equitable estoppel also requires the following elements with respect to the party asserting estoppel:
>
> (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Osborne v. Mountain Life Ins. Co*, 130 S.W.3d 769, 774 (Tenn. 2004) (citations omitted). While the facts of this case do not neatly fit into the elements as described,[8] the analysis is clearer if we consider the " facts" referred to in the elements to be Mrs. Smith's non agreement to the sale.

There can be no doubt that Ronnie Smith relied in good faith on the oral agreement to sell him the disputed property, nor that he changed his position in reliance on that agreement. Ronnie Smith made a $10,000 down payment on the property, faithfully paid $1,500 each month ($1000 more per month than his prior rental payments) to apply against the sales price, collected rent from

---

[8]The same would be true with most cases involving land sale agreements that do not meet the requirements of the Statute of Frauds. *Osborne* involved a claim that an insurer should be estopped from asserting a policy exclusion, and the cases it cited for the list of elements, *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990), and *Callahan v. Town of Middleton*, 292 S.W.2d 501, 508 (Tenn. Ct. App. 1954), involved, respectively, a claim of estoppel against a credit union from pursuing collection from a guarantor of a promissory note and estoppel asserted against a property owner in a suit for damages for a taking of property. However, this court applied this same list of elements in a case involving a claim there existed an oral agreement to convey real property. *Roach v. Renfro*, 989 S.W.2d 335, 339 (Tenn. Ct. App. 1998).

Randy Dillingham, and made expenditures of time and money to improve the property. In addition, ownership of the property was an integral part of his business and his plans for the future. He did not seek opportunities to purchase other property for his business and investment and lost any such opportunity or any return on investment he might have gained. Instead, he invested in the property at issue. It is clear that Ronnie Smith relied in good faith on the agreement to sell him the property at issue and upon the conduct of the sellers.

As to the conduct of Beverly Smith, setting aside for the moment the testimony of Ronnie Smith, it is clear she was aware that Ronnie Smith made improvements to the property and that her son paid rent to Ronnie instead of to herself and Mr. Smith. She made statements to others indicating her approval of the arrangement and statements indicating she was aware that the arrangement was a sale of the property. She did not object to the sale during its negotiation, when she was present, nor at any time thereafter. She went with her husband and Ronnie Smith to the bank to sign and have notarized the documents evidencing the sale and made statements to a third party indicating her knowledge of the purpose of that trip, even though it was unsuccessful. She assured others that Ronnie Smith would not be cheated, which they interpreted as assurances that all the paperwork to effectuate the agreement would be taken care of.

The "conduct" that gives rise to estoppel includes omissions as well as commissions and "embraces not only ideas conveyed by words written or spoken and things actually done, but includes the silence of such person and his omission to act, as well." *Church of Christ v. McDonald*, 171 S.W.2d at 821-22.

> Equitable estoppel, in the modern sense, arises from the 'conduct' of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience.

*Baliles*, 578 S.W.2d at 624. Silence, failure to act, or acquiescence may be sufficient to invoke equitable estoppel where, in context, they reasonably mislead another. *Church of Christ v. McDonald*, 171 S.W.2d at 821-22. There is no requirement that an actual intent to deceive be shown. *Id.* Instead, the basic premise is that once a party acts, or refrains from acting, in such a way as to indicate agreement, and another party reasonably relies on that indication of agreement, the first party cannot later assert a contrary position. Mrs. Smith never voiced any objection to, opposition to, or disagreement with the sale and was aware of Ronnie Smith's actions that were consistent with his presuming her agreement to it.

Our courts have invoked equitable estoppel on a number of occasions to prevent a property owner from refusing to perform an otherwise valid land sales contract when the owner's conduct indicated agreement with or an intent to fulfill the contract. *See, e.g., Baliles*, 578 S.W.2d at 623 (seller allowed purchaser to take possession and construct improvements and helped secure loan for the improvements); *GRW Enterprises, Inc.*, 797 S.W.2d at 613-14; *Hinton v. Stephens*, No. W2000-02727-COA-R3-CV, 2001 WL 1176012, at * (Tenn. Ct. App. Oct. 4, 2001) (although the contract

for sale stated the purchase price would be paid in one year, the parties were estopped to deny the continuing validity of the contract after that time based upon knowledge of the purchaser's occupancy of and improvements to the house); *Luzadder v. Fowler*, No. 01A01-9706-CH-00239, 1998 WL 30244, (Tenn. Ct. App. Jan. 28, 1998) (no Rule 11 perm.app. filed) (seller was estopped to deny sales contract after accepting property as down payment, accepting "house payments," and allowing buyers to make improvements). This case is no less appropriate for the application of equitable estoppel.

After thoroughly examining the record, it appears to us that despite her repeated denials, the overwhelming proof in this case shows that Beverly Smith was fully aware that the arrangement was a sale. It is undisputed that she was present in the same room when Benton Smith and Ronnie Smith reached their agreement and that she failed to make any objection. In fact, Ronnie Smith testified that she made approving comments at the time, to the effect that she wouldn't have to collect the rent from her son anymore. Ronnie also testified that she made him promise that if he ever decided to sell the property, he would give Randy the first chance to buy it.

Mrs. Smith herself testified that she and her husband sometimes had problems collecting the rent from Randy and that she was aware that Randy had stopped paying rent to them after the meeting in their living room. She admitted that she accompanied Benton and Ronnie Smith to the bank on the day that they attempted to have the warranty deed and promissory note notarized, but she claimed that she did not know what they were doing. Other witnesses testified that they had heard her make comments that indicated her awareness of the agreement, her approval of the transaction, and her intent to go through with it. Mrs. Smith's conduct certainly gave the impression that she acquiesced in the sale, at its inception and throughout, until after her husband's death.

Consequently, we conclude that Beverly Smith should be estopped from denying her assent to the sale of the subject property. The trial court indicated the evidence supported application of the doctrine of equitable estoppel. We agree.

The trial court's decision not to apply equitable estoppel because of Mrs. Smith's offer to reimburse Ronnie Smith for the expenses he incurred due to the arrangement was based on language in some older cases that limit it to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression . . . ." *Baliles*, 578 S.W.2d at 624. Finding that reimbursement would eliminate the element of hardship or oppression, the trial court declined to apply estoppel.

The trial court's stated reasoning confuses the elements of equitable estoppel with the remedies available once those elements have been established. The required elements of equitable estoppel, listed above, do not include hardship. In the case before us, once those elements were shown to exist, Mrs. Smith was estopped from asserting the Statute of Frauds so as to avoid the agreement to sell the property. The result is that a contract was shown to exist. The elements of hardship, on the one hand, and windfall, on the other, are equitable considerations to be applied in determining whether the contract should be enforced through specific performance or whether other

-11-

remedies are more appropriate. One party cannot limit, by a unilateral offer which is not accepted, the successful party's remedies. We find no legal justification for the proposition that a seller is entitled to limit a buyer's remedies, or avoid performance of a contract, by simply agreeing to reimburse the buyer for out-of-pocket costs.

Ronnie Smith asked for specific performance of the contract of sale. The trial court's award to Ronnie Smith of a judgment for reimbursement of monies he expended on the subject property and its purchase was akin to damages for breach of contract. The question of whether a contract should be specifically performed depends upon the facts of each case, and is a matter addressed to the sound discretion of the trial court. *Hillard v. Franklin,* 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000). Specific performance is only appropriate where the contract is clear, definite, and free from any suspicion of fraud or unfairness. *Shuptrine v. Quinn,* 597 S.W.2d 728, 730 (Tenn.1979*)*.

However, our courts have long recognized the preference for specific performance when dealing with contracts for the conveyance of real property, "because real property is unique, and more often than not, an award of damages is simply not an adequate remedy." *GRW Enterprises, Inc.,* 797 S.W.2d at 614; *see also Shuptrine*, 597 S.W.2d at 730; *McGaugh v. Galbreath,* 996 S.W.2d 186, 191 (Tenn. Ct. App.1998). Because of the unique nature of real property, this court has given its approval to the proposition that "equity will decree specific performance of a contract for sale of land, as a matter of course, in the absence of any valid objection, where the contract is valid." *Brister v. Brubaker's Estate,* 336 S.W.2d 326, 332 (Tenn. Ct. App. 1960).

The Restatement of the Law of Contracts has adopted the following rule to apply to situations such as the one before us:

> A contract for the transfer of an interest in land may be specifically enforced notwithstanding failure to comply with the Statute of Frauds if it is established that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement.

Restatement (Second) of Contracts § 129 (1981).[9]

The property at question does not only represent a financial investment for Ronnie Smith; it is also the long-time location of his business. He chose to invest in this property, foregoing other opportunities. An award of just his out-of-pocket expenses does not compensate him for any increase in the value of the property, lost investment opportunity, and other damages he might suffer

---

[9]Although the comments to this section indicate it is based in part on the "part performance doctrine," and Tennessee courts have refused to enforce oral contracts for land "on the basis of part performance alone," *Baliles*, 578 S.W.2d at 624, the rule refers to a change of position in reasonable reliance on the agreement, which is also one of the required elements of equitable estoppel. In other words, simply paying money toward the purchase, which would constitute partial performance, may not be a sufficient change of position to warrant the application of equitable estoppel in Tennessee. In any event, the Restatement rule deals primarily with the remedy of specific performance.

were he deprived of the benefit of the agreement he has relied on and lived up to. Under the circumstances, we conclude that Ronnie Smith is entitled to specific performance.

## V.

We reverse the judgment of the trial court and declare the agreement for the purchase and sale of land enforceable. Consequently, Ronnie Smith is entitled to specifically enforce the agreement to sell him the land. To the extent further proceedings may be necessary to reconcile the parties' current situation with the agreement, the case is remanded to the trial court for any such proceedings. Tax the costs on appeal to Beverly Smith.

_____
PATRICIA J. COTTRELL, JUDGE