IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 28, 2017 Session

### GARY L. KEY v. O.C. RENNER JR. ET AL.

**Appeal from the Chancery Court for Greene County**
**No. 20080032        Douglas T. Jenkins, Chancellor**

_____

### No. E2016-01049-COA-R3-CV

_____

Neighboring property owners disagree over the terms of an oral agreement for construction of a private road across their properties. After the road was completed, one property owner failed to pay his part of the construction costs or grant a permanent easement permitting use of the road. The other property owner filed a complaint for specific performance or, in the alternative, damages for breach of contract. The defendant admitted the parties had an agreement but disputed the terms and raised the defense of the statute of frauds. After a trial, the court ruled that the defendant was equitably estopped from asserting the statute of frauds and awarded specific performance. On appeal, the defendant argues that the plaintiff is not entitled to enforce the agreement because either the statute of frauds bars enforcement of the agreement or the plaintiff was the first party to breach. After a thorough review of the record, we affirm the judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right Judgment of the Chancery Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Mark A. Cowan, Morristown, Tennessee, for the appellants, O.C. Renner Jr., and the Omer C. Renner Jr. M.D. Living Trust.

William S. Nunnally, Greeneville, Tennessee, for the appellee, Gary L Key.

# OPINION

## I.

### A.

The tracts of land relevant to this case lie within a bend of the Nolichucky River on the border edge of Greene County, Tennessee, and were originally part of a 200-acre farm owned by W.C. Scruggs. Over time, portions of the Scruggs farm were sold to various individuals, including the parties to this case, Gary Key and Dr. O.C. Renner. In 2005, Dr. Renner transferred all of his real property to the Omer C. Renner Jr. M.D. Living Trust (the "Renner Trust").[1]

The properties in this area are, for the most part, undeveloped. The nearest county road is Fish Hatchery Road. The Scruggs family owns property on both sides of the county road. Gwendolyn Renner, Dr. Renner's sister-in-law, owns property that lies south of Fish Hatchery Road. The Renner Trust owns two nonadjacent tracts: one tract south of Gwendolyn Renner's property and a second one south of Mr. Key's property. Mr. Key's property is bordered on two sides by the Renner Trust properties and on two sides by the Nolichucky River.[2] Although neither the Key property nor the Renner Trust properties have direct access to the county road, both men can reach their properties using an old private road on the Scruggs property by virtue of express easements not at issue here.

In 2005, Mr. Key began to explore his options for obtaining electricity to build a house on his land. He initially requested permission to attach onto the existing power line on property across the river, but the property owner refused. He was also refused permission to install power lines along his existing easement through the Scruggs property.

Eventually, Mr. Key approached his neighbor, Dr. Renner, and proposed that the two men build a new private road, "split" the cost, and grant each other a "right of way." Mr. Key offered to arrange for the road construction and donate the necessary labor to remove trees and brush along the proposed route. He also wanted to install a power line along the new road and offered Dr. Renner access to the power line for the Renner Trust properties. Dr. Renner accepted the proposal. But their oral agreement was never memorialized in writing.

---

[1] Dr. Renner is the trustee of the Renner Trust with authority to act on its behalf.

[2] See attached Appendix for a layout of the properties in question.

2

Dr. Renner mistakenly believed that, in addition to the properties previously described, he also owned a thirty-foot strip of land running along the edge of his sister-in-law's property. If this had been the case, he would own land connecting the upper Renner Trust property to Fish Hatchery Road. Because he thought the private road he planned to construct with Mr. Key might require more land, Dr. Renner attempted to purchase an adjacent section of his sister-in-law's property before construction began, but Mrs. Renner refused. Mr. Key also approached Mrs. Renner about purchasing the land, but when she did not respond, he did not pursue it further. The men proceeded with their plans and tried to stay within the area that they believed Dr. Renner already owned alongside of his sister-in-law's property.[3] During the course of this litigation, however, Dr. Renner discovered that he did not own the thirty-foot strip but instead had an easement through Mrs. Renner's property.

Mrs. Renner testified that, although she was aware that a road was being built on her property without her permission, she chose not to become involved. She never complained about the road or the power line and, at trial, voiced no objection to their continued use.

In the spring of 2006, Mr. Key hired Four Seasons Ground Service ("Four Seasons") to construct the new road. The original plan envisioned a simple twelve-foot-wide access road beginning at Fish Hatchery Road, proceeding along Mrs. Renner's property line, and continuing down through the upper Renner Trust property and the Key property to the lower Renner Trust property. The estimated cost was approximately $5000.

After Four Seasons began grading the new road, Dr. Renner suggested a location change for a portion of the road on the upper Renner Trust property to avoid a steep hill and an abrupt u-turn, and Mr. Key agreed. Dr. Renner also requested several more changes to improve future access to the lower Renner Trust property.[4] Again, Mr. Key did not object. So, the width of the proposed road was doubled to allow for two-way traffic. Also the construction quality was improved, and drainage tiles were added. Unsurprisingly, these changes increased the cost of the new road, and Mr. Key ultimately paid Four Seasons over $18,000.

Between March and June 2006, Four Seasons completed the basic grading and drainage for the new road. Subsequently, Mr. Key and Dr. Renner purchased and spread rock on the road bed and, in an effort to prevent erosion, sewed grass seed on either side. Dr. Renner also worked to improve water drainage issues on his property caused by the new road.

---

[3] Proof at trial revealed that while the road was within the thirty-foot strip, the power line was not.

[4] Dr. Renner planned a Christian campground on the lower property.

3

Once the road was graded, Mr. Key arranged with Greeneville Light and Power System to install a power line beside the new road. Mr. Key removed more trees and overhanging branches, as required by the power company, and paid for the installation. The power line was above ground until it reached Mr. Key's property. To extend the line to the lower Renner Trust property, Dr. Renner was required to pay the power company's fee and dig a trench for the line extension. The men intended to connect the road to the lower Renner Trust property after these items were completed.

Unfortunately, the relationship between Dr. Renner and Mr. Key deteriorated during the construction of the private road. And Dr. Renner became increasingly dissatisfied with the amount and quality of work performed by Mr. Key's men.[5] The two men also had a number of unrelated disputes that further soured their relationship, resulting in several alleged incidents of vandalism.

According to Mr. Key, when he asked Dr. Renner to pay half of the road construction costs and to execute a formal written easement, he refused. For his part, Dr. Renner maintained that he simply disagreed with Mr. Key's interpretation of the contract. Dr. Renner testified that he only agreed to pay twenty percent of the road construction costs and grant a personal license to use the road, not a permanent easement. But he acknowledged that, as of the time of trial, he had not paid any part of the Four Seasons invoice or granted Mr. Key an express easement.

Because Dr. Renner refused to perform, Mr. Key "stopped doing anything." When Dr. Renner subsequently attempted to extend the power line from the Key property to the lower Renner Trust property, Mr. Key ordered him to stop. In response, Dr. Renner placed barricades over the road at the boundaries of the upper Renner Trust property. Since March 2007, no one has used the new road.

B.

On January 22, 2008, Mr. Key filed a complaint in the Chancery Court for Greene County, Tennessee against Dr. Renner and the Renner Trust. Mr. Key alleged that Dr. Renner and the Renner Trust breached the oral agreement, committed trespass, and were unjustly enriched. Mr. Key sought specific performance or, in the alternative, damages for breach of contract, damages for trespass, and attorney's fees. The defendants admitted that there was an agreement but disputed the terms. The defendants also filed a counterclaim seeking compensation from Mr. Key for property damage and trespass.

---

[5] Dr. Renner complained that Mr. Key did not perform the majority of the labor necessary to clear the path for the new road as agreed. While he conceded that Mr. Key's men cut down trees and removed stumps, he explained that his own men removed and milled the felled trees and cleared the brush.

After a bench trial, the court ruled that the parties had a valid, enforceable oral agreement. The court found that they had orally agreed to construct a road, divide the construction costs eighty percent to Mr. Key and twenty percent to Dr. Renner, and grant each other reciprocal easements for use of the road. The court also determined that the agreement included a provision allowing Dr. Renner to attach the lower Renner property to the power line at his own expense.

The court decreed that specific performance was the appropriate remedy. Thus, Mr. Key received a monetary judgment for $6,297.62, representing Dr. Renner's share of the construction cost. The court also awarded Mr. Key and Dr. Renner permanent easements to use the new road, including that portion of the road on Mrs. Renner's property. The court also ruled that Dr. Renner was entitled to attach the lower Renner Trust property to the power line and to extend the road across Mr. Key's property, albeit at his own expense.

Although the court enjoined both parties from "blocking the other from the full and unimpeded use" of the road, the court allowed the two men to construct a gate at the entrance to the new road and divide the costs equally. The court's order also included a provision requiring Mr. Key and Dr. Renner to maintain the new road "at their joint and equal cost" and to share with Mrs. Renner the cost of maintaining the portion of the road on her property. The court declined to award additional damages or attorney's fees to either party.

The defendants filed a motion to alter or amend the court's order. The court denied the defendants' motion, and in so ruling, specifically found that Dr. Renner was equitably estopped from relying on the defense of the statute of frauds.

**II.**

On appeal, the defendants contend that the trial court erred in enforcing the oral agreement because it violated the statute of frauds. Alternatively, they argue that the trial court erred in ruling in Mr. Key's favor because he was the first to materially breach the agreement. Finally, they challenge the court's authority to grant a permanent easement over Mrs. Renner's property.[6]

In a non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the

---

[6] The defendants also raise on appeal whether the trial court erred in refusing to compel the court reporter to produce audio tapes used to create the trial transcript. The record reveals that the audio tapes were erased in the normal course of business after being transcribed. We conclude the trial court did not err in denying the defendants' motion to compel.

5

preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

## A. Statute of Frauds

The defendants admit that Dr. Renner and Mr. Key had an agreement but assert that the statute of frauds precludes enforcement of an oral agreement to grant a permanent easement. *See* Tenn. Code Ann. § 29-2-101(a)(4) (2012). Real property is considered "one of the most valuable types of property," and any action on a "contract for the sale of lands" is prohibited by the statute "unless the promise or agreement . . . [is] in writing, and signed by the party to be charged." *Id.*; *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 611 (Tenn. Ct. App. 1990). It is well settled that this provision of the statute of frauds includes express easements. *See Nunnelly v. S. Iron Co.*, 29 S.W. 361, 365-66 (Tenn. 1895); *Cellco P'ship v. Shelby Cty.*, 172 S.W.3d 574, 593 (Tenn. Ct. App. 2005); *Lee Highway & Assocs., L.P. v. Pryor Bacon Co.*, No. 03A01-9507-CV-00237, 1995 WL 619941, at \*3 (Tenn. Ct. App. Oct. 19, 1995) ("It is clear, beyond any doubt, that the right to go over the land of another is a right that must be in writing to be enforceable.").

The statute of frauds was enacted "to avoid perjury on the one hand and fraud on the other." *Baliles v. Cities Serv. Co.*, 578 S.W.2d 621, 623 (Tenn. 1979) (quoting *Price v. Tenn. Prods. & Chem. Corp.*, 385 S.W.2d 301, 308 (Tenn. Ct. App. 1964)). But "strict application of the Statute of Frauds can lead to evils as undesirable as those it was designed to limit or prevent." *Smith v. Smith*, M2004-00257-COA-R3-CV, 2005 WL 3132370, at \*6 (Tenn. Ct. App. Nov. 22, 2005). The statute was not intended to be used as a means to "refuse to perform what [a party] has agreed to do" or as "an instrument of hardship and oppression." *Baliles*, 578 S.W.2d at 624; *Cobble v. Langford*, 230 S.W.2d 194, 196 (Tenn. 1950); *see also GRW Enters., Inc.*, 797 S.W.2d at 611.

Thus, our courts have recognized exceptions to strict application of the statute. *Trew v. Ogle*, 767 S.W.2d 662, 664 (Tenn. Ct. App. 1988). For instance, oral agreements that violate the statute may be enforced if one party has partially performed. *See Buice v. Scruggs Equip. Co.*, 250 S.W.2d 44, 48 (Tenn. 1952) (explaining that partial performance "is purely an equitable doctrine and is a judicial interpretation of the acts of the parties to prevent frauds"). The partial performance exception, however, does not apply to oral agreements affecting real property.[7] *Baliles*, 578 S.W.2d at 624; *Buice*, 250 S.W.2d at

---

[7] Mr. Key asks this Court to adopt a new exception to the statute of frauds that would allow enforcement of an oral agreement involving real property when one party has fully performed. We decline to do so. "While in many jurisdictions an executed contract takes the case from under the statute

6

47; *Trew*, 767 S.W.2d at 664.

Depending on the "totality of the factual situation," our courts have also held that a contracting party may be equitably estopped from asserting the statute of frauds. *Smith*, 2005 WL 3132370, at *7; *see Disney v. Henry*, 656 S.W.2d 859, 861 (Tenn. Ct. App. 1983) (enforcing oral agreement to convey land based on equitable estoppel). In this context, equitable estoppel

> "arises from the 'conduct' of the party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel."

*Baliles*, 578 S.W.2d at 624 (quoting *Evans v. Belmont Land Co.*, 21 S.W. 670, 673-74 (Tenn. 1893)).

The party seeking application of equitable estoppel must show that the party to be estopped: (1) conducted himself in a manner which "amounts to a false representation or concealment of material facts," or is "calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;" (2) intended or expected that the conduct would be acted upon; and (3) had actual or constructive knowledge of the true facts. *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004). The party asserting estoppel must also prove a lack of knowledge of the true facts on their own part and a prejudicial change in position in reliance on the conduct of the party to be estopped. *Id.*

Here, the trial court found that equitable estoppel applied because: (1) both parties agreed to the material terms of the contract; (2) Dr. Renner requested and obtained several changes to the proposed road, resulting in a massive increase in cost; (3) Mr. Key, in reliance on Dr. Renner's conduct, substantially performed his obligations; and (4)

---

of frauds, that does not seem to be the rule in Tennessee where the statute is enforced according to its letter with reference to real estate." *Daugherty v. Toomey*, 222 S.W.2d 197, 199 (Tenn. 1949); *see also Logan v. Estate of Cannon*, No. E2015-02254-COA-R3-CV, 2016 WL 5344526, at *9 (Tenn. Ct. App. Sept. 23, 2016) (rejecting similar argument that full performance of a contract affecting real property should prevent application of the statute of frauds). And the proof in this record does not support Mr. Key's claim that the contract was fully performed. It is undisputed that the power line and the road have not been extended to the lower Renner Trust property.

Dr. Renner was aware of Mr. Key's performance and never objected. The evidence in the record does not preponderate against these findings, and under these facts, we agree that Dr. Renner should be equitably estopped from relying on the statute of frauds. *See Thornton v. Marcum*, No. E2007-01326-COA-R3-CV, 2008 WL 836368, at \*3 (Tenn. Ct. App. Mar. 31, 2008) (concluding that because the defendant did not deny the existence of the agreement and never objected to the plaintiff's performance there was a "compelling reason" to apply the doctrine of equitable estoppel); *Luzadder v. Fowler*, No. 01A01-9706-CH-00239, 1998 WL 30244, at \*3 (Tenn. Ct. App. Jan. 28, 1998) (applying equitable estoppel when both parties agreed to the essential terms of the oral agreement and the defendant did not object to the plaintiff's performance).

Although Dr. Renner argues that he "did nothing wrong except refuse to follow through with an unenforceable agreement" after Mr. Key ordered him off of his property, we disagree. "Silence, failure to act, or acquiescence may be sufficient to invoke equitable estoppel where, in context, they reasonably mislead another." *Smith*, 2005 WL 3132370, at \*8. Actual intent to deceive is not required. *Church of Christ v. McDonald*, 171 S.W.2d 817, 821-22 (Tenn. 1943). Dr. Renner never denied that the parties had an agreement and, at all times, acted as if he intended to fulfill his obligations. He even requested and obtained several modifications to the original agreement which impacted the scope of Mr. Key's performance. As the trial court pointed out, if Dr. Renner had doubts about the enforceability of the oral agreement, he had ample opportunity to voice his concerns before Mr. Key had expended considerable time, effort, and money fulfilling his part of the agreement.

Dr. Renner further argues that this Court should refuse to apply equitable estoppel because of Mr. Key's conduct. At trial, Dr. Renner described several examples of what he characterized as bad behavior by Mr. Key and his agents during the performance of the contract. Mr. Key testified to his own version of events, and the trial court apparently credited Mr. Key's testimony over Dr. Renner's on this issue. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) (Generally, "findings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.").

When asked to review a trial court's determinations of witness credibility and the weight to be afforded particular testimony, we grant considerable deference to the trial judge who had the opportunity to observe the witnesses' demeanor and hear their in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Saddler v. Saddler*, 59 S.W.3d 96, 101 (Tenn. Ct. App. 2000). We will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We find no basis in this

record to overturn the trial court's determination that Mr. Key's conduct does not preclude the application of equitable estoppel.[8]

Our conclusion that equitable estoppel applies to these facts does not end the inquiry. Equitable estoppel is not an affirmative cause of action. *Deal v. Tatum*, No. M2015-01078-COA-R3-CV, 2016 WL 373265, at *8 (Tenn. Ct. App. Jan. 29, 2016). It merely removes the oral agreement from the operation of the statute of frauds. *Id.*; *see also Smith*, 2005 WL 3132370, at *9. Thus, we must consider the claim that Mr. Key cannot recover because he was the first party to materially breach the agreement.

## B. BREACH OF CONTRACT

"Ordinarily, a party who first materially breaches may not recover under the contract." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009). Dr. Renner maintains that the first breach occurred when Mr. Key denied him access to the power line. But Mr. Key claims that Dr. Renner breached first by refusing to pay his share of the construction costs and to execute a formal written easement.

The trial court found that Dr. Renner breached the agreement, not Mr. Key, and we agree. Dr. Renner's refusal to grant an express easement deprived Mr. Key of a material benefit of the agreement. *See McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) (listing the factors for determining whether a breach is material). Because Dr. Renner was the first to breach, Mr. Key's failure to continue his performance is not a bar to his recovery.

## C. SPECIFIC PERFORMANCE

Finally, we consider the defendants' challenge to the court's order directing specific performance. Specific performance is an equitable remedy commonly awarded in cases involving real property. *GRW Enters., Inc.*, 797 S.W.2d at 614. The decision as to whether specific performance is warranted in a given case is entrusted to the sound

---

[8] The defendants filed a motion to supplement the record with an affidavit from Kenneth Wilkins describing various additional examples of post-trial unneighborly behavior by Mr. Key and others. While the rules of appellate procedure give this Court discretion to consider certain post-judgment facts, "consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." Tenn. R. App. P. 14(a). "This rule is not intended to permit a retrial in the appellate court." *Id.* advisory comm'n cmt. We decline to exercise our discretion to consider additional evidence relevant to issues already litigated in the trial court. *See Duncan v. Duncan*, 672 S.W.2d 765, 767 (Tenn. 1984) (cautioning appellate courts not to use Rule 14 to renew factual issues from the trial).

discretion of the trial court. *Id.* "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

Here, the defendants have not challenged the trial court's decision that specific performance was the appropriate remedy, per se. Instead, they argue that we should reverse the grant of specific performance because the trial court awarded Mr. Key a permanent easement "through property currently owned by Gwendolyn Renner."

It is undisputed that Gwendolyn Renner is not a party to this action. *See Overby v. Overby*, 457 S.W.2d 851, 852 (Tenn. 1970) (describing the methods for bringing a party before the court). Personal jurisdiction is obtained through proper service of process. *Turner v. Turner*, 473 S.W.3d 257, 271 (Tenn. 2015); *see* Tenn. R. Civ. P. 4.04-4.05. Without personal jurisdiction, the court lacked the power to issue a judgment affecting Ms. Renner or her real property. *See Turner*, 473 S.W.3d at 271.

Ordinarily, we would vacate the court's order and remand this case for joinder of a necessary party to allow Mrs. Renner notice and an opportunity to be heard. *See* Tenn. R. Civ. P. 19.01; *St. Clair v. Evans*, No. 829, 1988 WL 102767, at *2 (Tenn. Ct. App. Oct. 6, 1988) (vacating and remanding when trial court ordered a resulting trust in favor of a nonparty). But Mrs. Renner no longer owns the real property at issue. After the trial, Mrs. Renner conveyed to Mr. Key the seven-acre strip of property between Fish Hatchery Road and the upper Renner Trust property encompassing the new road and the power line.[9] Under these unique circumstances, vacating the judgment and remanding the case would serve no purpose other than delaying resolution of the matter.

Even so, a decree for specific performance should enforce the contract as it was made by the parties. *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). Rather than simply enforcing the parties' agreement, the court included additional provisions for constructing a gate, maintaining the road, and the division of future costs. "Courts cannot make contracts for parties. They can only enforce the contract which the parties themselves have made." *McKee v. Cont'l Ins. Co.*, 234 S.W.2d 830, 831 (Tenn. 1950); *see also Parsons v. Hall*, 199 S.W.2d 99, 100 (Tenn. 1947) ("The Court will not make a contract for the parties and the agreement sought to be enforced specifically must show beyond doubt that the minds of the parties actually met and that they themselves made the agreement."). Thus, we vacate those portions of the court's

---

[9] Mr. Key filed a motion to supplement the record on appeal with the warranty deed evidencing the conveyance from Mrs. Renner and a copy of the survey of the land conveyed. *See* Tenn. R. App. P. 14(b). Because these post-judgment facts are "capable of ready demonstration," undisputed, and affect the position of the parties, we exercise our discretion to grant the motion. *Id.* 14(a).

10

judgment that go beyond the enforcement of the parties' agreement and those provisions that purport to affect Mrs. Renner. *See Couch v. Couch*, No. 03A01-9312-CH-00457, 1994 WL 715731, at *5 (Tenn. Ct. App. Dec. 21, 1994) (vacating the portion of the judgment that purported to affect a nonparty).

## III.

For the foregoing reasons, we vacate those portions of the court's judgment that expand the parties' agreement and those portions that purport to affect Gwendolyn Renner. Specially, we vacate those portions of the judgment requiring erection of a gate on the road and providing for future maintenance of the road. We affirm the judgment in all other respects.

_____
W. NEAL MCBRAYER, JUDGE

